# IN THE SUPREME COURT OF IOWA

No. 11–0016

Filed October 19, 2012

**LYNN G. LAMASTERS,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

On further review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Buchanan County, George L. Stigler, Judge.

Petitioner, who had previously been convicted of first-degree murder, appeals the denial of his application for postconviction relief. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Stephanie C. Rattenborg of Rattenborg Law Office, Manchester, for appellant.

Thomas J. Miller, Attorney General, Bruce L. Kempkes and Andrew B. Prosser, Assistant Attorneys General, and Allan W. Vander Hart, County Attorney, for appellee.

**MANSFIELD, Justice.**

Lynn Lamasters was convicted of first-degree murder in 2005. In 2009, he filed an application for postconviction relief alleging his trial counsel was ineffective for (1) failing to raise the defense of temporary insanity or diminished capacity and (2) failing to adequately support the request for bifurcation of his trial. Lamasters also asserted his appellate counsel on direct appeal was ineffective for failing to appeal the trial court's denial of his request for bifurcation. The postconviction court denied his application. The court of appeals affirmed, finding that the postconviction court did not rule on Lamasters's specific claims and Lamasters failed to preserve error by filing a subsequent motion under Iowa Rule of Civil Procedure 1.904.

We find that the postconviction court did rule on Lamasters's present claims, and they are properly preserved for appeal. However, we also find that these claims lack merit. Therefore, we affirm the denial of Lamasters's application for postconviction relief.

## I. Facts and Procedural History.

This case arises out of a brutal homicide. The basic facts are ably set forth in the court of appeals' opinion on direct appeal:

> Lamasters was living with Patricia Rapacki in Jesup, Iowa, along with her two daughters from previous relationships. On December 27, 2003, Lamasters and Rapacki took the children to visit their respective fathers for the holidays. Rapacki was not seen alive again.
>
> Lamasters spent the next several days extensively using methamphetamine. He sold the television and some of the furniture from the couple's home. He told friends and acquaintances various stories about Rapacki's whereabouts. He stated at times she was gambling in Minnesota, and at others she was gambling in Dubuque. Rapacki did not appear to pick up her children at the appointed time. Lamasters told one of the fathers that Rapacki had gotten drunk in Waterloo and put her car in the ditch, so she would be unable to pick up her child as scheduled. He told the

other father a friend had been injured in Minnesota, so he and Rapacki were going up there and would not be able to pick the child up at the time they had agreed upon.

On January 6, 2004, a deputy sheriff in Raymond, Iowa, noticed a car parked in front of a bank that was not yet open. The deputy drove by, and the car moved to a convenience store. The deputy then started to drive to the convenience store, when the car took off at a high rate of speed. The deputy chased the car until it stopped in a farm field. The driver, Lamasters, took off running. The deputy called for back-up, and a search of the farm field was made. Officers found Lamasters lying in a ditch with self-inflicted stab wounds to his abdomen. He was taken to the hospital.

Officers discovered the car driven by Lamasters was registered to Rapacki, and her purse was in the trunk. Officers questioned Lamasters at the hospital on January 6 and 7 without giving a *Miranda* warning. At that time officers did not suspect foul play, but wanted to know Rapacki's whereabouts because her car had been used in a high-speed chase. Lamasters stated Rapacki was gambling in Dubuque, and he was taking her purse to her. On January 7, officer Jane Wagner asked Lamasters if he believed Rapacki might have been harmed in some way. Lamasters replied, "They can tell time of death, right? And her time of death will state that I was not—or will show that I was not there."

Lamasters was questioned more extensively on January 9 and 11, while he was still in the hospital. On these occasions he was read his *Miranda* rights. Lamasters was released from the hospital on January 12, 2004. Methamphetamine had been found in the vehicle Lamasters was driving, and he was taken to jail for drug-related charges and parole violations.

Later on January 12, special agents with the Division of Criminal Investigation (DCI) and local officers executed a search warrant at Rapacki's home. They found a blood stain on the living room carpet, which was found to match the DNA of Rapacki.

In the basement, Rapacki's body was found inside a locked freezer. She had been killed by ligature strangulation with an electrical cord. DNA evidence showed Lamasters' blood was on the collar of Rapacki's sweater. His blood was also on a small piece of electrical cord on the floor outside the freezer. In addition, Lamasters' blood was on the inside of a knot in the electrical cord around Rapacki's neck. Four cigarette butts were found on the floor by the freezer, one matching Lamasters, two matching Rapacki's estranged

husband, Jeff Rapacki, and one unknown. The key for the freezer lock was found in the car Lamasters had been driving during the police chase.

Lamasters was charged with first-degree murder in connection with Rapacki's death. *See* Iowa Code §§ 707.1, .2 (2003). His attorneys in the jury trial were James Metcalf and David Dunakey. In November 2004, Lamasters filed a "Request to Bifurcate the Guilt Phase from the Issues of Insanity/Diminished Responsibility/Intoxication." In that motion, he argued that if he was required to argue "I didn't do it . . . but if I did I was insane" it would "undermine the defense to the charge to such an extent the Defendant will be denied a fair trial by a fair and impartial jury." The district court overruled Lamasters's motion, stating:

> Defendant has not yet even alleged an insanity defense. The court has no information to support defendant's apparent contention that his insanity defense may be substantial. Only if the court were presented with the situation in which an insanity defense and an evidentiary defense were substantial and prejudicially incongruent would the court consider bifurcation.

Lamasters filed a second motion to bifurcate in January 2005. This motion was filed contemporaneously with his "Notice of Defenses: Insanity/Diminished Responsibility," which was "conditioned on [Lamasters's] right to withdraw it in the event that the Court refuse[d] to allow the bifurcation of the trial." The second motion to bifurcate made reference to a preliminary psychiatric evaluation conducted by forensic psychiatrist, Dr. Thomas Gratzer. The motion also offered, for in camera review, correspondence from Dr. Gratzer to attorney Metcalf indicating Gratzer's opinion that "there was substantial evidence and/or substantial likelihood that Mr. L[am]asters['s] psychotic symptoms had risen to the level of an insane act with respect to the first degree murder charge." The State resisted the motion to bifurcate, while also seeking a

psychiatric evaluation of Lamasters and production of Dr. Gratzer's preliminary report. Lamasters opposed these requests. The trial court overruled Lamasters's second motion to bifurcate, finding it unnecessary to address the State's additional requests. In denying Lamasters's second motion to bifurcate, the district court explained:

> The court agrees that the Iowa courts have in the past suggested that a bifurcated trial may be appropriate under certain circumstances. *State v. Jenkins*, 412 N.W.2d 174 (Iowa 1987); *State v. Collins*, 236 N.W.2d 376 (Iowa 1975). The factors necessary for bifurcation have not been demonstrated in this case. The defendant should not be compelled to choose between exercising his Fifth Amendment right not to incriminate himself and his due process right to present a defense on the merits. However, the defendant has not demonstrated that a violation of his Fifth Amendment right not to incriminate himself is necessarily involved in the event he pursues his insanity defense. The defense has not demonstrated that the psychiatric examination and presentation of defendant's psychiatric defense necessarily involves inculpatory testimony which cannot be excised without diminishing the force of the insanity defense. *State v. Jenkins*, 412 N.W.2d 174 (Iowa 1987).

The court added that it had "evaluated the substantiality of the proffered [insanity] defense both on the merits and on the issue of insanity, and conclude[d] that based upon the information proffered to the court, it [wa]s appropriate to deny bifurcation." Finally, the court commented:

> It appears that the defendant in this case is not prepared to allege that his psychiatric examination will necessarily be inculpatory. Rather, the defendant makes the blanket assertion that "an insanity defense will create an unfair mindset in jurors, essentially negating any other defense the defendant may assert." . . . This assertion is really no different than a problem any litigant—civil or criminal, plaintiff or defendant—encounters when presenting alternative theories.

Lamasters went to trial without raising either an insanity or a diminished capacity defense. On April 5, 2005, the jury found Lamasters guilty of first-degree murder. As required by Iowa law, he was sentenced

to life in prison without the possibility of parole. *See* Iowa Code § 902.1. The court of appeals affirmed Lamasters's conviction, rejecting arguments that the district court erred in permitting the State to introduce evidence of Lamasters's flight and in denying Lamasters's motion to suppress statements he made on January 6 and 7, 2004. *See State v. Lamasters*, No. 05–0927, 2006 WL 3018129 (Iowa Ct. App. Oct. 25, 2006).

On February 14, 2007, Lamasters filed a pro se application for postconviction relief. After obtaining appointed counsel, Lamasters filed an amended application, which alleged, among other things, (1) "[i]neffective assistance of Appellate Counsel on failing to raise on Appeal the Trial Court denial of bifurcation on the issues of Guilt and an insanity defense," (2) "[i]neffective assistance of Trial Counsel on failing to pursue a defense of temporary insanity," and (3) "[i]neffective assistance of Trial Counsel in failing to present adequate and available evidence to support a claim for bifurcation of issues of guilt and insanity or diminished capacity defense." Lamasters subsequently filed a second amended application for postconviction relief, which added further grounds for relief.

On November 18, 2010, the district court held a hearing on Lamasters's application for postconviction relief. Deposition testimony was submitted from Lamasters, his trial attorneys Metcalf and Dunakey, and Dr. Gratzer. On December 23, 2010, the court issued a four-page order denying Lamasters's application. The order began by describing the claims set forth in the application. According to the district court, these included claims that "trial counsel was ineffective in that (1) counsel failed to pursue a defense of temporary insanity, (2) counsel[] [failed] to present evidence in support of an application to bifurcate

issues of temporary insanity and diminished capacity," as well as a claim that appellate counsel was ineffective in "failing to challenge on appeal the denial of bifurcation of trial on the issues of guilt and insanity."

The court's ruling went on to acknowledge that certain postconviction issues originally raised by Lamasters had been conceded by him in his trial brief. The court then continued:

> The issues remaining for disposition by this court are (1) whether trial counsel and appellate counsel rendered ineffective assistance of counsel by failing to raise the issues of temporary insanity or diminished capacity, (2) whether trial counsel and appellate counsel rendered ineffective assistance of counsel by failing to raise the issues of bifurcation of trials on guilt and temporary insanity, (3) whether counsel rendered ineffective assistance of counsel by failing to present testimony by the medical examiner as to the time of death, and (4) whether trial counsel, David Dunakey['s], hearing problems and personal distractions caused counsel to render ineffective assistance of counsel.

After discussing the law applicable to claims of ineffective assistance of counsel, the district court proceeded to address issues three and four above. It then made the following observations:

> The trial judge . . . ruled on the issue of bifurcating trial on the merits from any issue of the applicant's alleged temporary insanity. Both defense counsel at trial indicated that they never asked Mr. Lamasters whether he committed the crime. To date, Mr. Lamasters continues to deny he committed the crime. Any testimony by the applicant's present expert, Dr. Gratzer, is unavailing on that point.

The court's ruling concluded, "The Application for Post-Conviction Relief is DENIED. Court costs . . . are assessed to Lynn Gene Lamasters."

Lamasters appealed to this court. The three argument headings in his appellate brief were: (1) "trial counsel was ineffective in failing to raise the issues of temporary insanity and/or diminished capacity," (2) "trial

counsel was ineffective in failing to sufficiently support the request for bifurcation," and (3) "appellate counsel was ineffective in failing to raise the issue of bifurcation on [direct] appeal." We transferred the case to the court of appeals.

The court of appeals affirmed the judgment of the district court. However, the court did not reach the merits of Lamasters's appeal. Instead, it accepted the State's argument "that error was not properly preserved" for appellate review because the district court "failed to rule on the claims presented, other than a general denial of [Lamasters's] application." The court concluded, "Lamasters failed to file a rule 1.904 motion to obtain a more specific ruling, and error was not preserved."

We granted Lamasters's application for further review.

## II.  Standard of Review.

" 'Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law.' " *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012) (quoting *Goosman v. State*, 764 N.W.2d 539, 541 (Iowa 2009)). "However, when the applicant asserts claims of a constitutional nature, our review is de novo. Thus, we review claims of ineffective assistance of counsel de novo." *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III.  Analysis.

**A. Error Preservation.** This case requires us to revisit the question of when an appellant needs to file a postruling motion in order to preserve error. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "When a district court fails to rule on an issue

properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal." *Id.*

In *Meier*, we considered this subject at some length. That case involved an interlocutory appeal from the denial of a motion to dismiss a petition. In the trial court, Senecaut III had argued that dismissal should be granted for three reasons: (1) "the district court had no jurisdiction to reinstate the petition after Meier filed the unconditional dismissal of the petition on September 23"; (2) "the length of time between the filing of the petition and his service of process constituted abusive delay"; and (3) "service of the altered original notice failed to conform to rule 49(a) and (c)." *Id.* The district court denied the motion, but only discussed the second and third grounds in its ruling. *Id.* On appeal, Senecaut III tried to raise all three grounds.

We found that Senecaut III had waived the first ground for dismissal. As we explained, the preservation of error rule

> requires a party seeking to appeal an issue presented to, but not considered by, the district court to call to the attention of the district court its failure to decide the issue. The claim or issue raised does not actually need to be used as the basis for the decision to be preserved, but the record must at least reveal the court was aware of the claim or issue and litigated it.

*Id.* at 540 (internal citations and footnote omitted). We continued:

> In this case, Senecaut III properly raised the issue regarding the jurisdiction of the court to reinstate the petition. In his motion to dismiss and to quash, he specifically claimed the voluntary dismissal deprived the court of any jurisdiction. Clearly, Senecaut III raised the issue. However, this was not the only issue raised in support of the motion so that the denial of the motion to dismiss by the district court would necessarily mean the issue was considered. Additionally, the record fails to reveal that the jurisdictional issue was considered by the district court through other means. There was no record of the hearing on the motion and the district court did not address the issue in the written ruling on the motion. The district

court confined its written ruling to the issues of delay in service of process and the alteration of the original notice.

*Id.* at 540–41. Accordingly, we found "the record fails to show the jurisdictional claim was considered by the district court" and the issue was therefore "waived." *Id.* at 541.

Our *Meier* decision also addressed the proper procedural mechanism for asking a court to rule on an issue that had been overlooked. We said that rule 179(b) (now rule 1.904(2)) is one means, but not the only means, for requesting such a ruling. *Id.* at 539. As we explained:

> [T]he preservation of error doctrine does not require the request for a ruling to be made under [rule 1.904(2)]. There is no procedural rule solely dedicated to the preservation of error doctrine, and a party may use any means to request the court to make a ruling on an issue. Furthermore, we treat a motion by its contents, not its caption.

*Id.* Thus, a motion raising the court's failure to decide a purely legal issue could still be described as a rule 1.904(2) motion, and it would preserve error. *Id.*[1]

We have reiterated the *Meier* holding in subsequent cases. *See, e.g.*, *State v. Krogmann*, 804 N.W.2d 518, 524 (Iowa 2011) (stating that "when a court fails to rule on a matter, a party must request a ruling by some means"); *Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 181, 187 (Iowa 2007) (finding a claim that was not addressed in the district court's summary judgment order and not subsequently brought to the court's attention had not been preserved for appeal); *Stammeyer v. Div. of Narcotics Enforcement*, 721 N.W.2d 541, 548 (Iowa 2006) (finding an argument not preserved for appeal when there was "nothing indicating

---

[1]However, we have cautioned that a rule 1.904(2) motion raising a purely legal issue does not extend the time for appeal. *See In re Marriage of Okland*, 699 N.W.2d 260, 265–66 & n.2 (Iowa 2005).

the court ruled upon or even considered [it]"); *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 751 n.4 (Iowa 2006) (stating that "[w]hen a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal").

However, it should be emphasized that the foregoing rule is not concerned with the substance, logic, or detail in the district court's decision. If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is "incomplete or sparse," the issue has been preserved. *See Meier*, 641 N.W.2d at 540; *see also Jensen v. Sattler,* 696 N.W.2d 582, 585 (Iowa 2005) (finding error was preserved even though "the summary judgment record is not a model of clarity"). *Meier* distinguishes between the situation where error was preserved even though "the record or ruling on appeal contains incomplete findings or conclusions," 641 N.W.2d at 539, and the situation where the issue was "not considered by" the district court and thus error was not preserved, *id.* at 540.[2]

---

[2]Of course, if the appellant claims as error on appeal that the district court *failed to make sufficiently specific findings and conclusions*, then the appellant must file a rule 1.904(2) motion to preserve *that* point. *Starling v. State*, 328 N.W.2d 338, 341–42 (Iowa Ct. App. 1982). Here, however, Lamasters does not question the specificity of the court's findings and conclusions; he challenges only the ultimate ruling.

We think the text of subsection (1) of rule 1.904 provides insight into the circumstances under which the use of a rule 1.904(2) motion is contemplated. Rule 1.904(1) states

> The court trying an issue of fact without a jury, whether by equitable or ordinary proceedings, shall find the facts in writing, separately stating its conclusions of law, and direct an appropriate judgment. *No request for findings is necessary for purposes of review.* Findings of a master shall be deemed those of the court to the extent it adopts them.

Iowa R. Civ. P. 1.904(1) (emphasis added). If a party does not need to request findings in order to obtain review of a court decision, then a deficiency in the quantity or quality of findings on an issue should not preclude review of that decision, so long as the record indicates the court considered the issue and resolved it.

Applying those principles here, we find that error was preserved on Lamasters's present appellate arguments. Lamasters first argues to us that trial counsel was ineffective "in failing to raise the issues of temporary insanity and/or diminished capacity." This very claim was specifically noted in the district court's ruling. That court said, "The issues remaining for disposition by this court are (1) whether trial counsel . . . rendered ineffective assistance of counsel by failing to raise the issues of temporary insanity or diminished capacity . . . ." The court then provided several paragraphs of discussion on various points before concluding, "The Application for Post-Conviction Relief is DENIED." Where the trial court's ruling, as here, expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error. *See Meier*, 641 N.W.2d at 540 ("The claim or issue raised does not actually need to be used as the basis for the decision to be preserved, but the record must at least reveal the court was aware of the claim or issue and litigated it."). This is not one of those cases where the court failed to mention the issue. *Cf. Addison Ins. Co. v. Knight, Hoppe, Kurnik & Knight, L.L.C.*, 734 N.W.2d 473, 480 (Iowa 2007) (rejecting argument that error had been preserved on the issue of forum non conveniens where "[t]he only reference to convenience in the district court's decision was in the context of its analysis of personal jurisdiction").

Furthermore, while the district court did not provide a lengthy analysis of Lamasters's claims, some of the court's discussion was relevant to this particular ineffective assistance claim. The court noted that "[t]o date, Mr. Lamasters continues to deny he committed the crime." This would tend to undermine either a temporary insanity or a diminished responsibility defense. With both defenses, it is assumed the

defendant committed the acts in question. The insanity defense, however, urges that the defendant was "incapable of knowing the nature and quality of the act [being committed] or incapable of distinguishing between right or wrong in relation to that act." *See* Iowa Code § 701.4; *State v. Becker*, 818 N.W.2d 135, 144 (Iowa 2012). A defendant asserting diminished responsibility maintains he or she lacked the required specific intent of the crime charged. *See Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008); *State v. Jacobs*, 607 N.W.2d 679, 684 (Iowa 2000).

We likewise find that Lamasters preserved error on his claim that trial counsel was ineffective in failing to sufficiently support the request for bifurcation. This is a much closer call, though. Clearly Lamasters raised the claim in his application for postconviction relief and discussed it in his trial brief. In the first page of its ruling, the district court specifically noted that such a claim had been raised. However, when the district court later went on to list "[t]he issues remaining for disposition by this court," after mentioning certain other issues conceded by defense counsel, it recharacterized the issue somewhat. Instead of stating the issue was whether trial counsel had been ineffective in not *supporting* the request for bifurcation, it spoke in terms of a combined issue, namely "whether *trial counsel and appellate counsel* rendered ineffective assistance of counsel by failing to *raise* the issues of bifurcation of trials on guilt and temporary insanity." This recasting of the issue does not make sense, because no one disputed that trial counsel had moved for bifurcation and because it could not have been ineffective assistance for appellate counsel to fail to raise an issue if trial counsel had also failed to raise it.

Thus, the record suggests the postconviction court *may have* misunderstood Lamasters's claim. Lamasters was not questioning trial

counsel's failure to move for bifurcation, he was questioning counsel's failure to support such a motion. The better and safer practice would have been for Lamasters to call the district court's attention to this potential oversight by filing a motion.

Nevertheless, faced as we are with a ruling that correctly describes the applicant's claim, but is followed later by an inaccurate restatement of that claim, and followed finally by a denial of the entire application, we cannot say that the court failed to consider and rule upon the matter. For one thing, as we have pointed out, the district court's recapitulation of the claim on page two, as opposed to its original statement of the claim on page one, makes no sense. Thus, we believe it is more reasonable to conclude the court was simply being a little careless in its restatement of the claim, not that it misunderstood what Lamasters was arguing. Also, because this is a postconviction relief proceeding, finding that counsel below failed to preserve error by filing a motion would simply pave the way for another application for postconviction relief, alleging ineffective assistance by postconviction relief counsel.

Finally, we conclude that Lamasters has preserved error on his claim that his original appellate counsel should have appealed the denial of bifurcation. This claim is correctly summarized on both the first and the second pages of the district court's ruling, before the court denied the application in its entirety.

**B**. **Ineffective Assistance of Counsel.** We turn now to the merits of Lamasters's appeal. As noted, Lamasters urges on appeal three separate grounds of ineffective assistance of counsel: (1) trial counsel was ineffective in failing to raise the issues of temporary insanity and diminished capacity; (2) trial counsel was ineffective in failing to sufficiently support the request for bifurcation; and (3) appellate counsel

was ineffective in failing to raise the issue of bifurcation on appeal. "[A]ll postconviction relief applicants who seek relief as a consequence of ineffective assistance of counsel must establish counsel breached a duty and prejudice resulted." *Castro v. State*, 795 N.W.2d 789, 794 (Iowa 2011) (citing *State v. Carroll*, 767 N.W.2d 638, 644 (Iowa 2009)); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). "We may affirm the district court's rejection of an ineffective-assistance-of-counsel claim if either element is lacking." *Anfinson*, 758 N.W.2d at 499.

On the breach of duty prong, Lamasters must demonstrate his trial attorney performed below the standard demanded of a "reasonably competent attorney." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693 (citation and internal quotation marks omitted); *see also Ledezma*, 626 N.W.2d at 142. "[W]e measure the attorney's performance against 'prevailing professional norms.' " *Ledezma*, 626 N.W.2d at 142 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694). We start with the presumption that the attorney performed competently and proceed to an individualized fact-based analysis. *Id.* "[I]neffective assistance is more likely to be established when the alleged actions or inactions of counsel are attributed to a lack of diligence as opposed to the exercise of judgment." *Id.* "Improvident trial strategy, miscalculated tactics or mistakes in judgment do not necessarily amount to ineffective counsel." *Hinkle v. State*, 290 N.W.2d 28, 34 (Iowa 1980). "When counsel makes a reasonable tactical decision, this court will not engage in second-guessing." *Fryer v. State*, 325 N.W.2d 400, 413 (Iowa 1982). "Selection of the primary theory or theories of defense is a tactical matter." *Schrier v. State*, 347 N.W.2d 657, 663 (Iowa 1984); *see also Pettes v. State*, 418 N.W.2d 53, 56–57 (Iowa 1988).

To meet the prejudice prong, Lamasters must show his counsel's "errors were so serious as to deprive [him] of a fair trial." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. Even if Lamasters can show his counsel made a professionally unreasonable error, the judgment shall not be set aside unless it can be shown the error had an effect on the judgment. *Id.* at 691, 104 S. Ct. at 2066, 80 L. Ed. 2d at 696. A showing that the error "conceivably could have influenced the outcome" of the proceeding is not enough. *Id.* at 693, 104 S. Ct. at 2067, 80 L. Ed. 2d at 697. Rather, the effect must be affirmatively proven by a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; *see also King v. State*, 797 N.W.2d 565, 572 (Iowa 2011). "[R]easonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. In a challenge to a criminal conviction, the appropriate question to ask is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S. Ct. at 2068–69, 80 L. Ed. 2d at 698; *see also Ledezma*, 626 N.W.2d at 143.

As we discuss below, we need not examine the breach of duty prong on Lamasters's ineffective-assistance claims because all of Lamasters's claims can be resolved on the prejudice prong. *Ledezma*, 626 N.W.2d at 142 ("If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently."); *see also Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699.

1. *Failure to present a defense of temporary insanity and/or diminished capacity.* Lamasters relies on the December 15, 2004 letter of Dr. Gratzer as well as Dr. Gratzer's subsequent testimony in the postconviction relief proceeding to argue that his trial counsel should have pursued an insanity or diminished capacity defense. In December 2004, Dr. Gratzer wrote there is "substantial evidence and/or substantial likelihood that Mr. L[am]asters['s] psychotic symptoms had risen to the level of an insane act with respect to the first degree murder charge." By 2010, his recollection of Lamasters's mental condition was fairly limited but he testified that "it was [his] opinion at that time . . . that [Lamasters] was fairly mentally ill at the time of the event and that there was evidence that he had psychotic symptoms that may have risen to the level of an insanity defense." As he put it, "I felt that it was reasonable to pursue a more thorough evaluation regarding an insanity defense." Dr. Gratzer added that the insanity defense is "very restrictive" and that he has only found one person out of approximately 1000 evaluations who met the criteria for the defense. Yet he felt that Lamasters "might" meet the criteria and recommended further evaluation to Lamasters's counsel, who elected not to pursue the matter further.

Lamasters also points to his self-inflicted stab wounds on January 6, 2004, and his subsequent reports to the hospital that he "was hearing voices," in addition to a prior hospitalization for suicidal thoughts in the year 2000. In short, Lamasters argues that if his trial counsel had presented an insanity or diminished responsibility defense, there is a substantial probability the outcome would have been different.

To this day, however, Lamasters has no expert opinion that he was legally insane at the time of the killing.[3]  Nor does his own postconviction testimony support such a defense.  Instead, at the hearing, Lamasters was unrepentant and continued to deny he had killed Rapacki.  All he could remember about the December 2003/January 2004 time period was that he was "out partying, waiting to come back to prison [because of a parole violation].  Doing a lot of drugs and a lot of drinking."  He said his relationship with Rapacki at the time of the killing "was fine."  Lamasters added, "I have problems with my memory all the time," and, "Everybody forgets shit."  He said that "[o]bviously somebody murdered" Rapacki but "I didn't kill her" and "I didn't murder her."

Furthermore, eyewitness testimony at the 2005 trial did not suggest Lamasters was incapable of knowing the nature and quality of his acts or incapable of distinguishing between right or wrong in relation to those acts during the December 2003/January 2004 time period.  In order to cover up Rapacki's disappearance, Lamasters related numerous false stories about her whereabouts to friends and family.  He first said that neither he nor Rapacki could pick up Rapacki's oldest daughter on December 28 because a friend had had a serious accident and Lamasters needed to travel to Rochester, Minnesota, to visit him in the hospital.  Later, he told an elaborate tale about a trip he and Rapacki had planned to take to a Minnesota casino, indicating she had gone before him and he was to follow her there on New Year's Eve.  Lamasters's other stories included assertions Rapacki was in Farley, Iowa, with friends; Rapacki was drunk and had wrecked a vehicle in Waterloo, Iowa; and Rapacki

---

[3]In the postconviction proceeding, Dr. Gratzer testified, "I think it's possible to do an evaluation today on his mental state in December of '03 or January of '04."  However, he had not done such an evaluation.

had gone gambling with friends in Dubuque, Iowa. Lamasters further attempted to cover up Rapacki's disappearance by telling witnesses and investigators he had taken trips to those various locations to meet Rapacki or to look for her. In short, Lamasters told many inconsistent stories. Their only common denominator was that all were false and all would have led others to believe Rapacki was still alive.

While covering up Rapacki's disappearance to friends and family, Lamasters set about the task of selling, or attempting to sell, Rapacki's personal items and accessing the funds in her bank account. Testimony showed Lamasters attempted to liquidate Rapacki's car, television, DVD player, couch, and household furniture. He enlisted the help of friends and family to rent a U-Haul truck, load and unload items, transport furniture, and store property which belonged to Rapacki. Further, he attempted to negotiate the sale of the items to various businesses and acquaintances, and even collected money for the sale of the same set of furniture from multiple parties.

Witnesses also testified that Lamasters frequently used drugs in the days following Rapacki's disappearance, which he confirmed in his postconviction deposition. Before his arrest, Lamasters had clear plans of continuing his days of partying as, on two separate occasions, he told witnesses of his intention to hire strippers for entertainment at the upcoming birthday party he was planning to throw for himself.

Additionally, both of Lamasters's trial counsel testified at the postconviction relief hearing that their client had persistently denied killing Rapacki. They felt it would be difficult to argue to the jury that Lamasters had not committed the killing (e.g., by suggesting that Rapacki's estranged husband, whose cigarette butts were also found by the freezer, was culpable) while simultaneously arguing that if Lamasters

did kill her, he was insane. Metcalf, the more experienced criminal defense attorney of the two,[4] added that he thought an insanity defense involving a client who had been on a methamphetamine binge "probably couldn't be sold to an Iowa jury and particularly . . . a Buchanan [County] jury."

In light of all the foregoing, we cannot find a reasonable probability on this record that an insanity defense would have been successful. No expert has opined that Lamasters was legally insane at the time of the killing. Dr. Gratzer did not say that Lamasters was insane at the time of the killing, only that it was a possibility. *See Anfinson*, 758 N.W.2d at 502 (finding that the defendant "failed to demonstrate a reasonable probability of the success, or even viability, of an insanity defense" where her expert did not opine she was insane at the time of the victim's death). Even if an insanity defense had been presented, the trial testimony, and Lamasters's own postconviction relief testimony, indicate that the prosecution would have had considerable material to rebut that defense. Lamasters's more experienced criminal lawyer testified that he thought such a defense "probably couldn't be sold" to a jury. In sum, we conclude the viability of an insanity defense is at best speculative.[5]

---

[4]Dunakey concedes that Metcalf was "way more experienced in what was going to fly in terms of an insanity defense."

[5]Lamasters argues that his drug use and his act of stabbing himself before he was apprehended lend credibility to an insanity defense. But the overall impression one gets from the trial testimony is a pattern of deception used by Lamasters to prevent friends, family and authorities from discovering what happened to Rapacki. He spent several days selling off her possessions and using drugs. Throughout that time period, Lamasters spent most nights with either his sister or brother, both of whom testified he had acted normally. He continued living his daily life, drinking, partying, and doing drugs, and he created stories as necessary to account for Rapacki's whereabouts and evade suspicion. These appear to be the acts of someone who is aware he has committed a crime and who calculates steps to avoid detection. These acts do not foreclose an insanity defense, but they certainly do not support it.

Lamasters further argues his counsel should have presented a defense of diminished responsibility that could have negated the intent element required for first-degree murder. *See Anfinson*, 758 N.W.2d at 502–04 (explaining that the defense of diminished capacity may reduce a first-degree murder charge to second-degree murder). The common law defense of diminished responsibility " 'permits proof of defendant's mental condition on the issue of defendant's capacity to form a specific intent in those instances in which the State must prove defendant's specific intent as an element of the crime charged.' " *State v. Douglas*, 485 N.W.2d 619, 621 (Iowa 1992) (quoting *State v. Gramenz*, 256 Iowa 134, 139, 126 N.W.2d 285, 288 (1964)).

Yet Lamasters's arguments here fall short for the same reasons that his insanity arguments do not succeed. Lamasters offered no expert opinion relating to diminished responsibility. Dr. Gratzer has no recollection if he was even aware of Lamasters's methamphetamine use. And Lamasters elaborate efforts to *conceal* the killing seem to belie the notion that he lacked the mental capacity to *premeditate* a killing. *See Jacobs*, 607 N.W.2d at 685 (noting the trial court's conclusion that the defendant's "intricate transactions . . . to cover up the thefts" weighed against a diminished responsibility defense and affirming the trial court's rejection of that defense). Considerable trial evidence was presented that Lamasters carried on ordinary activities in late December 2003 and early January 2004 despite his ongoing drug use. Given the lack of evidence in the postconviction relief record to support a defense of diminished capacity, we cannot find there was a reasonable probability such a defense would have swayed a jury.

2. *Bifurcation.* We now turn to Lamasters's related claims that (1) trial counsel were ineffective in failing to sufficiently support the

request to bifurcate the trial on the issues of guilt and insanity, and (2) appellate counsel were ineffective in failing to challenge the trial court's denial of the motion to bifurcate on direct appeal.

In *Jenkins*, we considered the question of whether a criminal trial should be bifurcated into guilt and insanity phases. 412 N.W.2d at 176. In that case, the defendant, who had been charged with first-degree sexual assault and first-degree burglary, "posed alternative defenses of intoxication, insanity and alibi." *Id.* at 175. Before trial he

> moved to bifurcate the trial on the ground that "[i]f defendant is forced to present this [insanity defense] testimony at the same trial on the charges themselves, it will be impossible to prevent the jury from inferring the defendant is admitting guilt, [thus] there is no way to ensure a fair trial without bifurcation."

*Id.* at 175–76. This request was denied, and the defendant was subsequently found guilty on both counts. *Id.* at 175.

On appeal, the defendant argued "the trial court abused its discretion by denying his pretrial motion to bifurcate the trial on the issues of insanity and guilt" because "in Iowa a defendant is entitled to a bifurcated trial when the psychiatric examination forces the defendant to disclose information otherwise protected by the fifth amendment." *Id.* at 175–76. The defendant cited two of our prior cases for the proposition that "the importance of bifurcation to the fairness of the defendant's trial is said to be determined by the extent to which the psychiatric examination elicits inculpatory testimony which cannot be excised without diminishing the force of the insanity defense." *Id.* at 176 (citing *Collins*, 236 N.W.2d at 382–83 (Rawlings, J., concurring); *State v. Moses*, 320 N.W.2d 581, 583 (Iowa 1982)).[6]

---

[6]In *Moses*, an appeal from a first-degree murder conviction, we upheld the denial of a motion to bifurcate where the State's experts "did not testify to any incriminating

Alternatively, the defendant invoked "the alleged prejudice inherent when evidence relevant only to the issue of sanity becomes tantamount to a confession of guilt." *Id.* at 176 (citing *United States v. Bennett*, 460 F.2d 872 (D.C. Cir. 1972)). Thus, the defendant urged us to follow a federal appellate case that concluded bifurcation should occur "where the defendant presents a substantial defense both on the merits and on the issue of sanity." *Id.* (citing *Bennett*, 460 F.2d at 878).

In our *Jenkins* decision, we assumed for purposes of appeal that bifurcation could be required in both scenarios. *Id.* Yet we found neither scenario existed. *Id.* The defendant had only a "feeble alibi," which could not "reasonably be characterized as a 'substantial defense.'" *Id.* Also, the psychiatric testimony "yielded no admissions or inculpatory

---

statements or admissions made by the defendant." 320 N.W.2d at 583. However, we did not expressly indicate when bifurcation should occur. *Id.*

*Collins* was a sexual abuse case where the defendant sought a court-ordered mental evaluation to support an insanity defense. 236 N.W.2d at 377. In the course of the examination, the defendant related his version of events, and the State later called the examining psychiatrist as a witness at trial. *Id.* The defendant objected to that portion of the psychiatrist's testimony on the ground he had not been given *Miranda* warnings prior to the evaluation. *Id.* at 378. The trial court overruled the objection and the defendant was subsequently found guilty. *Id.* On appeal we affirmed the trial court's ruling because the defendant had not been "subjected to custodial interrogation nor was he being questioned [o]n behalf of law enforcement officers." *Id.*

Justice Rawlings specially concurred, discussing in some detail the issues raised by self-incriminating statements in the course of forensic psychiatric examinations. He concluded:

> [W]here a defendant is examined as to his or her sanity as bearing upon the accused's criminal responsibility for the act charged, whether such be initiated by the defendant, the prosecution or sua sponte order of the court, any self-incriminating information obtained from an accused in course thereof shall not be admitted in evidence, over appropriate objection, during trial of the examined defendant in which guilt or innocence is to be determined.

*Id.* at 382 (Rawlings, J., concurring). Justice Rawlings went on to state that if "a psychiatrist is unable to testimonially evaluate defendant's legal responsibility absent reference to incriminatory statements made by the accused, then a bifurcated hearing would be unavoidable and appropriate." *Id.* at 383.

statements. Defendant simply professed no recollection of the crime." *Id.* Hence, we concluded the district court did not abuse its discretion in denying the defendant's motion to bifurcate. *Id.*

In this case, the district court denied Lamasters's motion to bifurcate principally on the ground that Lamasters had not shown that his psychiatric examinations had included or would include inculpatory admissions. On appeal, Lamasters argues that he did make inculpatory statements in his session with Dr. Gratzer and that counsel were ineffective in failing to bring them to the district court's attention. To be clear, Lamasters does not dispute that he has consistently denied killing Rapacki. Yet he points to the following testimony from Dr. Gratzer regarding their interview:

> I do remember as he was being questioned that there was the issue of him [Lamasters] denying the offense. And the interview technique that I used was "If you had committed the offense, while I understand that you're denying it, what would have been the reasons for it," and he actually answered that question.

Thus, as Dr. Gratzer explained:

> Mr. Lamasters, while denying the offense, then acknowledged that if he had committed the offense, these would have been some of the reasons why he did it.
>
> So while he was denying the offense, he at another point was giving reasons why he might have committed the offense, so it might be seen as incriminating. I don't know.

Lamasters argues that if this information had been presented to the district court, bifurcation would have been ordered, he would have then put on an insanity defense in the second phase of the trial, and the insanity defense would have had a reasonable prospect of success. Based on our independent review of the record, however, we are not persuaded by Lamasters's arguments. To begin with, there are no notes

or other documents to confirm Dr. Gratzer's recollection that Lamasters answered hypothetical questions in the interview.[7]  Both Dunakey and Metcalf recalled that Dunakey was responsible for the bifurcation issue, yet Dunakey specifically denied being aware that Lamasters "made statements in response to hypothetical questions from Dr. Gratzer that were incriminating."  In Dunakey's view, this was an important fact he would have wanted to present had he been aware of it.  Metcalf was apparently the person in direct communication with Dr. Gratzer, but Metcalf added, "I don't remember Dr. Gratzer having expressed to me that he [Lamasters] had admitted participating in the act."  Dr. Gratzer states on the other hand that he "probably" would have told counsel if Lamasters had given reasons for his actions in response to hypothetical questions.

We are unable to conclude from this record that Lamasters's counsel actually had information about incriminating statements that they failed to provide to the district court.  The record indicates that defense counsel were very familiar with *Jenkins* and tried to present the best argument under that case for bifurcation.  If they had known of inculpatory statements made by their client to the psychiatrist, we believe they would have brought them to the court's attention.

In any event, we are not persuaded that the answers to hypotheticals described generally by Dr. Gratzer would have been sufficient by themselves to warrant bifurcation under *Jenkins*.[8]  Dr. Gratzer specifically recalled that Lamasters denied committing the

---

[7]Dr. Gratzer testified in the postconviction relief proceeding that he had not retained any records concerning this case.

[8]Lamasters argues that *Jenkins* sets forth the standard in this state as to when bifurcation is required.  We do not decide that question but assume Lamasters is correct for purposes of this appeal only.

offense. While Dr. Gratzer also remembered that Lamasters had answered hypothetical questions about his state of mind "if he had committed" the offense, these answers would not necessarily have posed more difficulties for the defense in a one-stage trial than the mere juxtaposition of two inconsistent defenses already posed. Without more detail about the alleged incriminating statements, we cannot say at the present time that a winning bifurcation motion could have been filed under *Jenkins.*

Even if the statements could be deemed inculpatory under *Jenkins,* Lamasters also has not shown that Dr. Gratzer would have been unable to testify equally effectively if the statements were simply excluded from evidence. *See Jenkins,* 412 N.W.2d at 176 (noting the need for bifurcation is said to be determined by the extent to which the incriminating admissions "cannot be excised without diminishing the force of the insanity defense").

Furthermore, to obtain postconviction relief, Lamasters has to show not only that a "better-supported" bifurcation motion would have been successful, but also that there is a reasonable probability his insanity defense would have prevailed in the second phase of a bifurcated trial. For the reasons we have discussed in the previous section of this opinion, we cannot reach that conclusion. Lamasters has not offered a psychiatric opinion that he was legally insane at the time of the killing, and the testimony of numerous lay witnesses tends to show he was in command of his faculties.

Finally, Lamasters argues that his counsel on direct appeal were ineffective for not raising the district court's denial of bifurcation when they appealed his conviction. However, the text of Lamasters's appellate brief makes clear that he is not quarreling with the district court's

decision to deny bifurcation on the record that was before it in 2005. Rather, this argument is simply a restatement of Lamasters's current contention that his trial counsel were ineffective in failing to make a *better* record. We have already explained why that argument does not justify relief.

### IV. Conclusion.

For the reasons stated, we affirm the district court's denial of Lamasters's application for postconviction relief.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Wiggins and Appel, JJ., who concur specially.

**WIGGINS, Justice (concurring specially).**

I specially concur in the outcome of this case. I agree that we should reach the merits of Lamasters's postconviction relief action and that Lamasters is not entitled to postconviction relief. However, I part ways with the majority on its error preservation analysis. Once again, the majority unnecessarily expands our well-settled error preservation rules in order to reach the merits of a case.[9] *See King v. State*, 818 N.W.2d 1, 43–49 (Iowa 2012) (Wiggins, J., dissenting).

The rule in Iowa, as opposed to the federal system, is that a defendant is entitled to effective assistance of counsel in a postconviction relief action. *Dunbar v. State*, 515 N.W.2d 12, 14 (Iowa 1994). Because of this rule, I would find logic dictates that there can never be an error preservation issue for failing to file a 1.904(2) motion in an ineffective-assistance-of-counsel case.

When an appellate court finds an error preservation problem on appeal in a case other than a postconviction relief action, the court does not address the unpreserved issue on appeal, and the appeal is final. In a postconviction relief action, our finding that error was not preserved due to a failure to file a rule 1.904(2) motion will only lead to the defendant filing another postconviction relief action, alleging postconviction relief counsel was ineffective. In the second postconviction relief action, the defendant will offer substantially the same evidence offered in the first action. This is a complete waste of precious judicial resources. Had the majority not contorted our error

---

[9]The tip-off that the majority is stretching our error preservation rules is when it states that error preservation is a close call.

preservation rules, this is exactly what would have happened in this case.

The better practice is to adopt an exception to our error preservation rules for a postconviction relief action and hold a defendant preserves error on all issues raised and litigated in the trial court, regardless of whether the defendant filed a rule 1.904(2) motion. This type of exception is not new to Iowa jurisprudence.

In *DeVoss v. State,* we held an appellate court may uphold evidentiary rulings on a theory not urged at trial based on "the realization that on retrial the error could easily be corrected." 648 N.W.2d 56, 62 (Iowa 2002). The basis of *DeVoss*'s holding is that it would be a waste of judicial resources to retry the case, when the same evidence would be admissible in a new trial under a different theory than previously urged in the trial court. *Id.*

The same reasoning applies here. If we were to agree with the court of appeals that Lamasters did not preserve error, he would probably refile his action, alleging ineffective assistance of postconviction relief counsel. The subsequent action would contain the same evidence as the prior trial. This makes no sense to me and is a tremendous waste of judicial assets.

Appel, J., joins this special concurrence.