# IN THE COURT OF APPEALS OF IOWA

No. 23-0689
Filed June 5, 2024

**ERIK GUADALUPE DAVILA,**
     Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
     Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wapello County, Crystal S. Cronk,

Judge.

The applicant appeals the denial of his application for postconviction relief.

**AFFIRMED.**

Alexander D. Smith of Parrish Kruidenier Gentry Brown & Messamer L.L.P.,

Des Moines, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee State.

Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Erik Davila appeals the denial of his application for postconviction relief (PCR) following his 2017 conviction for second-degree murder in the killing of Hugo Hernandez. Davila argues he was deprived of effective assistance because trial counsel failed to move to reopen the record to introduce evidence to rebut the State's contention during closing argument that Hernandez was asleep at the time Davila shot him. Davila contends the court would have reopened the record to rebut the State's inference that Hernandez was asleep when shot as it then became an issue that he should have been able to contest. We affirm the denial of the PCR application.

**I. Background Facts and Proceedings.**

The record from Davila's underlying criminal trial established the following:

Davila and Hernandez shared an apartment. Due to a variety of circumstances, Davila began having issues with Hernandez. On the day at issue, Davila and Hernandez were "hanging out" at Davila's brother's house while Davila was doing laundry. Hernandez had his handgun with him. At some point during the day, Davila and Hernandez loaded a clip of ammunition into the handgun.

Later, Davila called his friends Terry Baker and Kinda Short to see if he and Hernandez could come out to their residence, and they agreed. Baker and Short picked up Davila and Hernandez late in the evening, and they went to Baker and Short's house. The group sat in the living room; they talked and smoked methamphetamine and marijuana into the early morning hours. Then the group moved to the basement. Davila and Hernandez sat quietly in some chairs while Baker and Short were tending to other things. At some point, Davila got up, walked to the other side of the room, picked up Hernandez's handgun, walked over to Hernandez, held the gun approximately one foot from Hernandez's head, pulled the trigger, and shot and killed him.

Baker and Short did not witness the shooting, but they responded to the gunshot. Baker went to Hernandez and saw the gunshot wound in his head. Baker asked Davila for the weapon, and Davila complied. Davila said he would take care of the mess and dispose of the body. Davila asked for a tarp. Short became

hysterical. She left the residence and drove to her brother's house. Short's brother, Gary Short, was the owner of the house where Kinda Short and Baker resided. Gary went to the house. When he arrived, Baker told him Davila shot a guy and Davila wanted a tarp. Baker told him they needed to leave the house. They did. Gary and Baker went back to Gary's residence, and Gary called 911.

The sheriff's department responded to the emergency call. When the sheriff's department arrived at Baker and Short's residence, they found Davila kneeling outside. Hernandez was dead. He was rolled up in a rug in the basement. Davila was arrested at the scene and interviewed at the Wapello County Law Enforcement Center. During the interview, Davila admitted to shooting Hernandez and explained why he did it. Later in the interview, Davila stated he knew the gun was loaded but did not know there was a round in the chamber when he pulled the trigger. Two days later, Davila provided the authorities with a [handwritten] letter explaining why he shot Hernandez.

Davila was charged with first-degree murder. While in jail, he told others in the jail his reasons for killing Hernandez. One of the reasons was Hernandez was behind in his rent.

*State v. Davila*, No. 17-1062, 2018 WL 3913418, at *1–2 (Iowa Ct. App. Aug. 15, 2018).

Before the start of the criminal trial, the State moved in limine to exclude "[a]ny reference to any toxicology report[s] of [Hernandez] or testimony regarding [his] level of intoxication or drug impairment" and evidence regarding the amount of methamphetamine "as located during the autopsy in or upon [Hernandez's] clothing and/or person." The court granted the motion over Davila's objection.

While the parties were prevented from introducing evidence regarding Hernandez's exact level of impairment, the jury heard evidence that Hernandez, Davila, and the others smoked methamphetamine together on the night in question. Davila testified in his own defense at trial; he testified that he stood about a foot from Hernandez, who was seated and looking at him, and pulled the trigger of the gun to scare Hernandez. According to Davila, he thought "nothing" would

happen when he pulled the trigger because "the clip was loaded" but the gun "was never pumped into action." The State questioned whether Hernandez was awake or conscious at the time of the shooting; Davila testified he was awake.

During closing argument, the State raised doubts about Davila's testimony that Hernandez was looking at him when Davila pulled the trigger, stating:

> [The medical examiner] also gave the opinion that he was within 6 to 36 inches away from him, and that's consistent with [Davila] saying he pointed the gun, and he was 12 inches from [Hernandez's] face. What isn't consistent is [Davila] telling you yesterday that he pointed it at his head and [Hernandez] was looking right at him. That just can't be, because the science doesn't lie. [Hernandez] wasn't looking at him. He didn't have time to turn his head from a foot or less away. Didn't happen that way. Was [Hernandez] passed out? Was he asleep? He wasn't engaging with [Davila]. . . . What's the real story about that? Because [Hernandez] wasn't looking at him. He never saw it coming. It was point blank, and it was cold-blooded, and [Davila] knew that gun was loaded, because when somebody's passed out or asleep, you don't dry fire a gun to scare that person.

During the defense's closing, Davila's attorney responded, arguing:

> [The prosecutor] will have you believe that Mr. Hernandez was probably asleep. Really? We know that he smoked meth. Was he the only one immune to the [effects] of methamphetamine? Does methamphetamine make him go to sleep instead of staying up for hours and hours and hours on end? That makes no sense that he was asleep. We know all of them smoked methamphetamine.

During its rebuttal, the State repeatedly argued that Hernandez was asleep at the time Davila shot him. Davila objected and moved for mistrial, arguing the State's theory during closing—that he shot Hernandez while Hernandez was asleep or unconscious—"squarely put [the excluded] toxicology evidence into a position of being very relevant." Because of the State's argument, Davila claimed he should have been "allowed to let this jury know that [Hernandez] had, at the time of his death, 360 nanograms per milliliter of methamphetamine in his blood and 26

nanograms per milliliter of amphetamine in his blood, which we would have argued meant that no, he would not likely have been asleep." The State responded that while Davila had not been allowed to introduce evidence of Hernandez's specific level of intoxication, he was allowed to and did make the argument that Hernandez was not sleeping at the time of the shooting because of his use of methamphetamine in the hours preceding his death. The district court denied the motion for mistrial, concluding the jury would still be able to render an impartial verdict: "[T]he jury is going to be able to determine, without the exact amount of methamphetamine that was found in [Hernandez's] system, that the individuals were using methamphetamine and that everybody there was having a hard time going to sleep and that usually methamphetamine keeps you up."

The jury found Davila guilty of the lesser-included offense of second-degree murder; he was later sentenced to a term of incarceration not to exceed fifty years. Davila challenged his conviction and sentence on direct appeal, and we affirmed.[1] *See generally Davila*, 2018 WL 3913418.

Davila filed his PCR application in 2019. He argued he received ineffective assistance from trial counsel because counsel should have moved to reopen the record—rather than moving for mistrial—after the State introduced the idea during its closing that Hernandez was asleep at the time of the shooting. At the PCR hearing, Davila specified: "There was the opportunity to reopen the record, present the toxicology reports, present the defense expert indicating what that level of intoxication would have done to [Hernandez], because he wouldn't have been

---

[1] Procedendo issued on October 8, 2018.

asleep as was suggested." Davila did not call any witnesses at the PCR hearing; trial counsel was not questioned regarding why counsel chose to move for mistrial rather than reopen the record.

The district court denied Davila's application, deciding his ineffective-assistance-of-counsel claim on the prejudice prong. The court concluded that because Davila testified Hernandez was awake at the time of the shooting, any expert would have—at best—been able to opine it was unlikely Hernandez was asleep due to the amount of methamphetamine used, and because the jury was instructed to decide the case upon only the record evidence—which the State's closing argument was not—Davila failed to establish there was a reasonable probability that the result would have been different if trial counsel moved to reopen the record and introduced new evidence. Davila appeals.

**II. Standard of Review.**

We review PCR claims that trial counsel provided ineffective assistance de novo. *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012).

**III. Discussion.**

"[A]ll postconviction relief applicants who seek relief as a consequence of ineffective assistance of counsel must establish counsel breached a duty and prejudice resulted." *Id.* at 866 (alteration in original) (citation omitted). "Both elements must be prove[d] by a preponderance of the evidence." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). "We may affirm the district court's rejection of an ineffective-assistance-of-counsel claim if either element is lacking." *Lamasters*, 821 N.W.2d at 866 (citation omitted). "[W]e scrutinize each claim in light of the totality of the circumstances. In the end, the inquiry is transformed into

an individualized fact-based analysis." *Ledezma*, 626 N.W.2d at 142 (internal citations omitted).

"To establish the first prong, the applicant must demonstrate the attorney performed below the standard demanded of a reasonably competent attorney." *Id.* "Thus, we measure the attorney's performance against 'prevailing professional norms.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000) ("A defendant is not entitled to perfect representation . . . ."). "As such, we begin with the presumption that the attorney performed competently. Moreover, we avoid second-guessing and hindsight." *Ledezma*, 626 N.W.2d at 142 (internal citations omitted).

"To meet the prejudice prong, [the applicant] must show his counsel's 'errors were so serious as to deprive [him] of a fair trial.'" *Lamasters*, 821 N.W.2d at 866 (second alteration in original) (quoting *Strickland*, 466 U.S. at 687). Showing an error occurred is not enough—"the judgment shall not be set aside unless it can be shown the error had an effect on the judgment." *Id.* Davila has the burden to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). "In a challenge to a criminal conviction, the appropriate question to ask is 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id.* (quoting *Strickland*, 466 U.S. at 695).

Like the district court did, we jump to the prejudice prong of Davila's ineffective-assistance claim. *See Ledezma*, 626 N.W.2d at 142 ("If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the

attorney performed deficiently."). And we also conclude that Davila has not established by a preponderance of the evidence that there is a reasonable probability he would not have been convicted of second-degree murder if trial counsel moved to reopen the record and the defense expert was allowed to testify that, due to the specific amount of methamphetamine in Hernandez's body at the time of his death, it was unlikely he was asleep or unconscious at the time Davila shot and killed him.[2]

---

[2] In its appellate brief, the State argues:

> Davila's argument is entirely speculative; he has not produced an expert to testify how he or she would have testified at trial. Without that evidence, Davila could not meet his burden to show that the outcome of his trial would have been different if his attorney had successfully moved to re-open the record.

We do not find this argument persuasive. At his underlying criminal trial, Davila called a forensic toxicologist—Mr. Michael Rehberg—as an expert for the defense. Based on evidence Davila likely had 300-400 nanograms of methamphetamine in his blood at the time he shot Hernandez (based on testing completed several hours after police took him into custody), Mr. Rehberg was asked, "If an individual had three to four hundred nanograms of methamphetamine in his blood and two and a half nanograms per milliliter of delta THC—delta-9 THC in his blood, what would you expect the effects on the human being to be?" He responded:

> That human being would be affected greatly by that combination of drugs, and the one having the greatest effect is the stimulant, the methamphetamine, and its metabolite. Its metabolite would be there, and it is also a strong stimulant. That means this person would be probably hyperactive, could be paranoid, could be aggressive, could be fearful, could be in a state of hyperawareness, could speak rapidly, all the kinds of things you think about with stimulation. Probably would not have an appetite. It's a drug that suppresses your appetite. It also keeps you awake. You don't sleep well when you utilize this drug.

And based on the toxicology report from the autopsy of Hernandez, we know that he had 360 ng/ml of methamphetamine in his femoral blood at the time of his death—a number within the same range already posed to Mr. Rehberg. It does take not an inferential leap to conclude that the Mr. Rehberg would offer the same opinion as to the likely effect of that amount of methamphetamine in Hernandez as he opined regarding Davila.

While the jury was not informed of the exact amount of methamphetamine determined to be in Hernandez's blood at the time of his death, it was well aware that Hernandez—like Davila and the others—used methamphetamine in the hours before his death. The jury heard the defense expert's testimony that methamphetamine is "a strong stimulant" and "keeps you awake." Defense counsel alluded to this testimony during closing, when counsel explicitly challenged the State's assertion that Hernandez was asleep at the time he was killed. On top of that, the jury also saw photographs of the bullet hole in Hernandez's right front temple and heard from the medical examiner that Hernandez was shot from a range between six and thirty-six inches, making the claim that he was awake and looking straight at Davila seem less credible.

Plus, while Hernandez's state of consciousness was important insofar as it possibly contradicted Davila's claim that he fired the gun with the goal of scaring Hernandez, whether Hernandez was awake was not actually an element in dispute—Davila's mens rea was the issue. And whether the jury believed Hernandez was awake or not, it could conclude Davila acted with malice aforethought when he pulled the trigger; the jury was not obligated to believe Davila's explanation for his actions. *See State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001) ("Second-degree murder . . . does not require deliberation and premeditation; it requires only proof of malice aforethought."); *see also State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003) ("Malice aforethought is a fixed purpose or design to do some physical harm to another that exists before the act is committed. Like premeditation, it does not have to exist for any particular length of time." (cleaned up)). While "[t]he jury is [always] free to believe or disbelieve

any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive," *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993), we think the jury here was unlikely to credit Davila's testimony about only intending to scare Hernandez, regardless of the State's assertion about Hernandez's consciousness.  The jury heard evidence of Davila's earlier, less self-serving statements about killing Hernandez: he told other inmates he killed Hernandez because Hernandez was behind on rent, and he wrote in his confession to the police that he "was the one to kill [Hernandez] over a bitch."

For all of these reasons, Davila failed to prove the prejudice element of his ineffective-assistance claim.  We affirm the district court's denial of his PCR application.

**AFFIRMED.**