## IN THE COURT OF APPEALS OF IOWA

No. 14-1010
Filed February 11, 2015

IN THE INTEREST OF C.C.S.,
Minor Child.

J.G., Petitioner,
Appellant,

C.S., Respondent,
Appellee.

_____

Appeal from the Iowa District Court for Polk County, D.J. Stovall, Judge.

The father appeals the juvenile court's denial of his petition requesting termination of the mother's parental rights to their daughter, C.C.S. **AFFIRMED.**

Christopher B. Coppola of Coppola, McConville, Coppola, Carroll, Hockenberg & Scalise, P.C., West Des Moines, for appellant.

John Audlehelm of Audlehelm Law Office, Des Moines, for appellee.

Considered by Vogel, P.J., and Doyle and McDonald, JJ.

**VOGEL, P.J.**

The father appeals the juvenile court's denial of his petition to terminate the mother's parental rights to their daughter, C.C.S. The father asserts the court improperly found the mother had not abandoned the child within the meaning of Iowa Code section 600A.8(3)(b) (2013), and that it did not give enough weight to the guardian ad litem's report to the court recommending termination of the mother's parental rights. We conclude the juvenile court properly found the mother did not have the intent to abandon C.C.S. within the meaning of paragraph (3)(b), given the record reflects the mother made some effort to contact C.C.S., but was, at times, prevented from achieving contact by the father. Consequently, the court properly found the father did not prove abandonment by clear and convincing evidence, and we affirm the denial of the father's petition requesting termination of the mother's parental rights.

C.C.S., born November 2008, is a product of the brief encounter between the mother and father.[1] C.C.S. lived with the mother for the first six months of her life, then was removed by the Department of Human Services due to the mother's impending incarceration.[2] C.C.S. was placed with the father and has resided with him full-time since May 18, 2009; however, she had no contact with the father prior to being placed in his care. Upon filing a custody action, the father received permanent sole legal care and physical custody on March 31, 2010. The father is currently married, and C.C.S. refers to his wife as "mommy,"

---

[1] The mother has two older daughters. Both of them reside with their father full-time, and the mother has had somewhat consistent contact with them. She has visited them since her release from prison.

[2] The mother's criminal history includes convictions for theft, assault, driving while suspended, and forgery.

and as the guardian ad litem (GAL) noted, C.C.S. has no concept of any other mother. The father and his wife have two other biological children, and C.C.S. views them as her siblings.

During the summer of 2009, the mother was in and out of either prison or a halfway house. From September 2009 to May 27, 2010, the mother's visits with C.C.S. were somewhat sporadic, consisting of either supervised visitation or unsupervised overnight visitation pursuant to the custody order.[3] These visits resulted in the mother having contact with C.C.S. approximately fourteen times. The mother was incarcerated full time from November 1, 2010, until October 14, 2012. During this time she did not see C.C.S., nor was contact reestablished following her release.

While she was incarcerated, the mother wrote a total of seventeen letters, addressed either to C.C.S. individually or to all three of her daughters. The

---

[3] The GAL's report stated:

> When [the mother] moved into a halfway house in August, she had visits there for two (2) hours on Thursdays. These visits occurred for approximately one month. It is confirmed that visits occurred on September 27, 2009; October 29, 2009; November 8, 2009; November 22, 2009; and December 3, 2009. No visits occurred between December 3, 2009 and February 4, 2010.
>
> According to an agreement made with the assistance of the Department of Human Services on February 1, 2010, [the mother] would have visits every Thursday from 8 AM to 5 PM and every other Sunday from 5 PM to 8 PM. Beginning March 10, 2010, the schedule was to be every week from Wednesday at 6:30 PM to Thursday at 5 PM. After the district court custody order was entered on March 30, 2010, the expected schedule was every week from Wednesday at 6:30 PM to Thursday at 5 PM and every other weekend.
>
> During February, 2010, visits apparently occurred as scheduled, on February 4, 11, 14, 18, 25 and 28.
>
> . . . .
>
> Following entry of the custody order in district court, there were three final visits: overnight Wednesday April 21 to Thursday April 22, 2010; Friday April 23 to Sunday April 25, and overnight Wednesday May 26, 2010.

father never read these letters to C.C.S. or showed them to her. The mother also attempted to participate in several prison programs that would allow her to have some contact, such as making a recording of her reading a child's book, and a Christmas present program. However, the father refused to cooperate, which was required for the mother to participate in the program, and consequently, the mother's efforts did not result in any contact.

There is also some dispute as to the effort the mother went to when attempting to reestablish contact with C.C.S. subsequent to her release. The GAL's report asserts the father stated the mother, "beginning on the Monday immediately after [the mother's] release from prison she [would] call[] 'non-stop, all hours of night and day.'" The father maintains she would text message him sporadically asking how C.C.S. was doing, but he would either not reply or inform the mother he was waiting for a court-ordered resolution to the visitation issue. The mother asserts she sent text messages to the father nearly every day, to no avail. It is undisputed the mother arrived at the father's house unannounced sometime in August 2013, attempting to see C.C.S., but the father and his wife would not allow the mother inside. Consequently, the last time the mother had physical contact with C.C.S. was on May 27, 2010, when C.C.S. was eighteen months old. The GAL's report noted C.C.S. has no recollection of the mother.

There is evidence in the record indicating the mother is not current on her court-ordered child support in the amount of $245 each month. The GAL's report stated: "From October 9, 2009, to October 2, 2013, she paid a total of $2,391, or approximately 20% of the amount owed. She has sought unsuccessfully (2011) to have the child support amount 'reviewed and adjusted' and has recently

requested that service from the Child Support Recovery unit again." The report goes on to state that no adjustment was ever made, and the mother has not made payments since October 2013. However, no documentation was entered into evidence supporting the GAL's assertion. The report then noted the mother was unemployed and attempting to secure disability payments.

On October 23, 2013, the father petitioned the juvenile court to terminate the mother's parental rights pursuant to Iowa Code section 600A.8(3)(b).[4] The father then filed a petition requesting a GAL be appointed, and on August 9, 2013, the juvenile court appointed a GAL. She filed a report to the court on January 10, 2014—which was later supplemented—recommending that the mother's parental rights be terminated. A contested hearing was held on May 19, 2014, in which both the mother and the father appeared and testified. On June 4, 2014, the juvenile court issued an order denying the father's petition, and the father appeals.

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). The grounds for termination must be proved by clear and convincing evidence. *Id.* Additionally, to terminate the mother's parental rights under Iowa Code section 600A.8(3)(b), the father must prove by clear and convincing evidence that the mother abandoned the child. Abandonment is defined as follows:

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward

---

[4] The case was then transferred to Story County on May 24, 2013, the court of proper jurisdiction and venue.

support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
   (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
   (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
   (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Iowa Code § 600A.8(3)(b).

We agree with the juvenile court the father failed to meet his burden showing the mother abandoned C.C.S. within the meaning of this paragraph. The record reflects objective intent by the mother to contact C.C.S. It is undisputed the mother attempted to participate in prison programs that would facilitate contact, she wrote several letters, and sent numerous text messages to the father following her release from prison. She also went to the father's house sometime in August 2013 in an attempt to see C.C.S. Though the mother's own actions led to her criminal convictions, incarcerations, and general instability, they do not establish an intent to abandon C.C.S. within the meaning of paragraph (3)(b).

It is an important consideration that the mother has not seen C.C.S. since May 27, 2010, and C.C.S. has no recollection of the mother. However, the responsibility for the lack of a mother-daughter relationship is shared between the parents—the mother's attempts were sporadic, and the father, while attempting to shield C.C.S., resisted her overtures. In its findings of fact, the juvenile court stated: "Upon her release from prison, [the mother] contacted [the

father] for purposes of trying to make contact with C.C.S. The evidence showed that she was met with resistance at almost every turn." The record supports the court's finding. The father conceded he has not informed C.C.S. of the mother's existence, he did not read her the letters, and did not consent to participate in the prison programs, which was a requirement in order for the mother to participate. He did not make any effort to respond to the mother's requests to see C.C.S.

Consequently, while it is an important consideration that C.C.S. and the mother have not seen one another for several years and do not share any sort of bond, the father cannot rely on this fact alone to show the mother intended to abandon C.C.S., particularly when his actions thwarted the mother's occasional attempts to have contact with her daughter. A parent cannot prove abandonment when his actions prevented the other parent from achieving contact with the child. *See* Iowa Code § 600A.8(3)(b)(1) (noting contact can be shown when the parent: "Visit[s] the child at least monthly . . . *when not prevented from doing so by the person having lawful custody of the child*." (emphasis added)); *In re P.N.B.*, 730 N.W.2d 210, 211 (Iowa Ct. App. 2007) (noting any attempts by the mother to contact the child would have been thwarted by the father, and therefore abandonment could not be shown). Furthermore, while we concede the mother cannot rely on her incarceration as an excuse for a lack of contact with C.C.S., *see In re R.L.F.*, 437 N.W.2d 599, 602 (Iowa Ct. App. 1989), the record reflects the mother attempted to have some contact with her daughter even while in prison. Therefore, we conclude the juvenile court properly found the father did not meet his burden showing the mother abandoned C.C.S. within the meaning of paragraph (3)(b).

Furthermore, the juvenile court properly concluded the mother's lack of child support did not indicate she abandoned C.C.S..[5] Pursuant to the GAL's report, the mother made payments prior to her incarceration. She ceased to pay anything other than minimal amounts during her incarceration and did not resume payments upon her release. However, the mother is not employed, and it is not clear what her source of income is, if any. A parent is only required to pay child support in "a reasonable amount, according to the parent's means." *See* Iowa Code § 600A.8(3)(b). The record shows the mother paid child support when she could but now no longer has the means to do so. Consequently, we conclude the juvenile court properly found the father could not prove abandonment within the meaning of paragraph (3)(b). We therefore affirm the court's order denying the father's petition to terminate the mother's parental rights.

**AFFIRMED.**

---

[5] In the mother's brief, she asserts error was not properly preserved on this issue, primarily because the father did not present evidence supporting his claim the mother failed to pay the court-ordered child support. While the mother is correct in her assertion that the father's brief did not accurately reflect the law of error preservation, this does not preclude the determination that error was, in fact, preserved. The father raised this issue in his petition and argument to the court, evidence was presented in the form of the GAL's report, and the juvenile court clearly considered the issue in its order. It is therefore evident error was preserved. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) (holding error is preserved if the issue is presented before the district court and the record shows the court considered the issue, then ruled on it).