# IN THE COURT OF APPEALS OF IOWA

No. 14-0287
Filed August 5, 2015

IN THE INTEREST OF S.M.,
Minor Child,

E.M. AND C.M.,
Appellants.

_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

The guardians of S.M. appeal the juvenile court's denial of their petition to terminate the rights of the biological parents. **AFFIRMED.**

Jamie A. Splinter of Splinter Law Office, Dubuque, for appellants.

MaryBeth Fleming of MaryBeth Fleming Law Office, P.C., Dubuque, for appellee mother.

J.M., Neenah, Wisconsin, appellee father pro se.

Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, P.J.**

The guardians of the minor child S.M. appeal the juvenile court's denial of their petition to terminate the rights of the biological parents. They assert the court improperly concluded they failed to prove the father abandoned S.M. within the meaning of Iowa Code section 600A.8(3)(b) (2013), and subsequently erred in declining to terminate his parental rights. Though the guardians support the court's conclusion the mother abandoned S.M., they argue the court improperly found it is not in S.M.'s best interests the mother's rights be terminated. We conclude the juvenile court properly found the guardians failed to prove by clear and convincing evidence the father abandoned S.M. within the meaning of chapter 600A, given he has never failed to pay child support and has had somewhat regular contact with S.M. We also agree with the juvenile court's finding that although the guardians proved the mother's parental rights could be terminated under both section 600A.8(3)(b) and 600A.8(4), it is not in S.M.'s best interests to do so. Therefore, we affirm.

**I. Factual and Procedural Background**

S.M. was born in October 2007. E.M., her maternal grandfather, and his wife, C.M. (the guardians a/k/a the grandfather or grandmother), were appointed guardians in March 2009, and S.M. has been in their sole care since that time.[1] She is developmentally on track, has no special needs, does well in school, and appears to be thriving. S.M. only lived with the mother during the first year of her

---

[1] The mother testified she originally intended the guardianship to be a temporary arrangement.

life. Prior to the establishment of the guardianship, the father declined to have S.M. in his care.

The mother has moved many times and struggles with several personal issues, including criminal activity, an inability to maintain stable housing, and unemployment. In 2012, the guardians established a voluntary visitation schedule with the mother, in which she would visit S.M. on Wednesday each week. The mother attempted to increase these visits; however, she was not consistent with attending the established visits, and the guardian-grandmother testified the mother would spend a significant portion of the visits not interacting with S.M. Consequently, the guardians declined to increase the amount of visitation. As the juvenile court found: "The [visitation] parameters sought to not only provide consistency and routine for the child, but also to provide incentive to the mother to stabilize her life and make the child a priority, something mother has not yet been able to accomplish." All visits have been supervised by the guardians.

Additionally, there was a period of eight months while the mother was living in Colorado[2] in which she did not see S.M., as well as April until June, 2013, when she was pregnant with her second child.[3] She had little to no contact with S.M. through phone calls or letters during these periods. According to the juvenile court, the mother "has clearly made only marginal efforts to provide for the support of the child and to communicate with the child."

---

[2] The mother lived in Colorado from July 2009 until June 2011. She testified she returned to Iowa six times during this period but that she did not visit S.M. each time she was in the state.

[3] The mother voluntarily relinquished her rights to this child, who was later adopted.

At the time of the termination hearing the mother was unemployed and in debt for five to ten thousand dollars, according to her testimony. She has worked sporadically but has not paid increased child support during the times in which she earned money, nor did she pay voluntarily, as the Child Support Recovery Unit garnished her wages to satisfy her obligation.[4] She has been ordered to pay $10 each month in child support but at the time of trial was $60 in arrears and had only paid $200 since 2012. Other than buying a few toys and clothes, she has not otherwise financially supported S.M. For periods of time during 2012 and 2013, the mother attended classes at two institutions but did not complete any course work.

At the termination hearing held on January 7 and February 5, 2014, the guardians introduced evidence indicating the mother was selling "massages" on Craigslist. The evidence consisted of email exchanges between the account holder and men discussing things relating to the selling of sexual favors; the guardians found these emails in an account which the mother had logged into through S.M.'s Kindle. The mother denied she was a prostitute and further stated she was not the person selling the massages; rather, she stated she was corresponding with the customers on her friend's behalf. She admitted that it was her personal phone number that was given to the men who responded to the ad. Additionally, she testified she did not know what a customer meant when he asked: "Do you like me more than just a John?"

---

[4] With regard to her failure to satisfy her child support obligation, she testified that:

> I honestly didn't know that I had to pay child support. Now I realize it was pretty stupid, but when I had signed guardianship over to my dad, I had given him the card I received for child support and he basically told me that he wasn't going to ask me to pay child support.

Furthermore, the mother has a record of unstable living situations. As of the time of the termination hearing, she was living in Dubuque; in 2013, and the time in which she lived in Iowa, she testified she resided in approximately eight places, in which she paid little to no rent. She was also incarcerated for a period of time. Prior to the termination hearing, the mother would not reveal her address to the guardians. The mother also has a criminal history, which includes charges for operating while intoxicated, driving while revoked, and unlawful possession of prescription drugs,[5] and which has resulted in the mother's incarceration.

The mother has suffered from several health issues. Medical records established the mother sought treatment for severe back issues, a hip issue resulting from a break, I.B.S.,[6] and Crohn's disease. The mother also testified she is seeing a psychiatrist for an anxiety disorder; though one doctor noted she suffers from depressive disorder, the mother stated she did not agree with that diagnosis. She has been prescribed two medications for anxiety and one sleep medication. She has also been prescribed several pain medications and muscle relaxers due to her hip and back issues. Additionally, the guardians opined the mother suffers from an addiction to prescription drugs, something the mother denied.

The father currently resides in Oshkosh, Wisconsin and works for Federal Express. He earns a base salary of $54,000 with the potential for bonuses, as

---

[5] The mother testified these charges were pending and, because she had a prescription for these medications, the charges were to be dropped.

[6] The mother testified that because she suffers from irritable bowel syndrome, which symptoms include severe instances of vomiting, she cannot parent S.M. during the times when she is sick.

well as receives a rent subsidy and other benefits. He is current with regard to his child support obligation of $60 per week—an amount that has never been increased, though the father's salary has grown over the course of S.M.'s life.[7] He also provides S.M. with health insurance, and what is not covered by this insurance is covered by Title XIX. He has provided no other support for S.M.

From the time S.M. was born until she was two years old, the father lived in Iowa. He moved to Chicago in January 2010 and lived there until June 2012, when he moved to Madison, Wisconsin.[8] During the time he lived in Chicago, he had phone contact with S.M., and the father's mother brought S.M. to Chicago three to four times to visit the father. After moving to Wisconsin, the father testified he had monthly contact with S.M. from June 1, 2012, until August 15, 2013. However, the father did not have contact with S.M. for sixty-nine days prior to the February 5, 2014 termination hearing; he stated this was due to his strained relationship with the guardians.[9] He also testified his sporadic face-to-face contact with S.M. was due to the geographical distance as well as his busy work schedule. Testimony further established S.M. visited the paternal

---

[7] With regard to his financial support of S.M., in the father's testimony he stated: "I pay child support now, and it's a struggle, but, you know, I also look at the fact that I don't claim her on my taxes."

[8] All of the father's moves were due to career opportunities.

[9] The record supports that the strained relationship was the product of the filing of the second amended petition and not reflective of the relationship over the previous five years. As the guardian-grandfather testified:

> A: I mean, I do have the respect for you. You're a hard worker. As far as you and I, I've never really had a problem with you, [the father] . . . .
>
> Q [By the father]: And then would you say that with the situation that's arose here that there has been some animosity between us, and there hasn't been a lot of communications amongst ourselves, which there had been prior to court proceedings? . . . Would you say that relationship has diminished, or that there's been animosity between us, due to this? A: I would say yes.

grandmother's home, which was also in Iowa, every other weekend until shortly before the termination proceedings; however, the father was not there each weekend, leaving S.M. in the paternal grandmother's care. The guardian-grandfather testified they had regular contact with the paternal grandmother and shared transportation, thus affording S.M. regular visits with her.

With regard to the father's relationship with S.M., the guardian ad litem (GAL), in her report to the court, stated:

> During our conversation [on October 31, 2013, the father] stated he was resisting the petition to terminate his parental rights, but acknowledged that he was not capable of having [S.M.] live with him mainly due to his busy and unpredictable work schedule. [The father] did not have any major issues with Petitioners in terms of their care for [S.M.] [S.M.] sees her dad about every other weekend. There are times that during those weekends [S.M.] spends time with her grandmother, [the father's] mother, and not her dad. He spends time with [S.M.] during his vacation time also. [The father] does not attend [S.M.'s] school functions. He has been to her school perhaps once to have lunch with her this school year. He did not have routine phone contact with [S.M.] up until recently and [S.M.] talked about speaking with her dad on the phone every day.

At the termination hearing, the father contested these assertions, stating:

> [A]t the time [of the interview], no, I didn't think that I was going to be able to do it with my work schedule. I was moving into a new role, I'd only been in that role for two months. You know, I think anybody in the past, when you're doing something new, yeah, it's a challenge . . . . Do I think that I can now provide a stable environment for [S.M.], provide for her financially, and I'm going to have to put clothing and food on the table and clothes on her back every day? Yeah, I can do that. But again, this is just to prove a point that my hours have changed quite a bit. I have managed it . . . . I've taken those steps, and made those necessary adjustments to get myself in a better situation for my daughter.

At the termination hearing, the guardian-grandmother testified S.M. was becoming confused regarding her living situation. The grandmother stated that

after visits with the mother, S.M. would report the mother told her she was going to live with the mother. Additionally, the guardian-grandmother testified:

> [L]ast night, [S.M.] got a phone call from her dad. Of course—sometimes her parents say things to her they shouldn't say to a six-year-old, and her dad called last night and said "I want you to come and live with me. Your Nanna and Poppa are trying to take you away from me." Inappropriate, I think, and that really confused her. I tried to explain it to her and she got upset and she said, "Mom says this to me and dad says this to me, and I get confused and things start going around in my head." And she does get confused.

The guardians petitioned to terminate the mother's rights to S.M. on August 29, 2013, alleging the mother abandoned S.M. and failed to pay child support within the meaning of Iowa Code sections 600A.8(3)(b) and 600A.8(4), respectively.[10] An amended petition was filed on September 9, 2013. A second amended petition was filed on January 8, 2014, which asserted the grounds upon which to terminate the father's parental rights under Iowa Code section 600A.8(3)(b), that is, abandonment.[11] All versions of the petitions contained this

---

[10] Two other grounds—600A.8(1) and 600A.8(5)—were also alleged, but both were later dismissed by the juvenile court.

[11] The petition and amended petition alleged:
> [S.M.'s] father is involved in her life, but has always been in agreement to [S.M.] living with Petitioners. The Petitioners want to ensure that [the mother's] parental rights are terminated, so that they may adopt her. If the Court or the State of Iowa requires that [the father's] rights are terminated in order to protect [S.M.] from [the mother], then they request the court to take that step as in the best interest of the minor.

In the second amended petition, the language was changed to read:
> [S.M.'s] father is involved in her life *to a limited decree* (sic), but has always been in agreement to [S.M.] living with Petitioners. The Petitioners want to ensure that [the mother's] parental rights are terminated, so that they may adopt her. *Given that Petitioners are filing this termination of parental rights action to adopt the minor child for her to forever live in their home, the rights of [the father] to the minor child should also be terminated in the best interest of the child.*

(Emphasis added.)

statement as to the father: "He maintains contact with the minor and provides financial support for her needs."

In the GAL's report to the court, she recommended termination of both the mother's and father's parental rights, as "they have done nothing to parent [S.M.] in a meaningful, full-time way." A contested hearing was held on January 7, and February 5, 2014, in which the father, the mother, the guardians, and the GAL testified. The guardians and the mother were represented by counsel; the father appeared pro se. On February 18, 2014, the juvenile court found termination was appropriate as to the mother, pursuant to Iowa Code section 600A.8(3)(b) and (4), but that termination was not in S.M.'s best interests. It further held the guardians failed to show by clear and convincing evidence the father abandoned S.M.; consequently, it declined to terminate either parents' rights. The guardians appeal.[12]

## II. Standard of Review

We review termination proceedings brought pursuant to Iowa Code chapter 600A de novo. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We are not bound by the juvenile court's findings of fact, but we accord them weight, particularly with regard to its findings on the credibility of witnesses. *Id.* Our primary concern is the best interests of the child. *Id.*

## III. Termination

The guardians first argue the court improperly declined to terminate the mother's and father's parental rights. They claim they have shown by clear and convincing evidence the father abandoned S.M., as the father failed to parent

---

[12] The father appeared at the termination trial pro se and has not filed a brief of appeal.

S.M., and only had contact with her when it was at his convenience and initiated by his mother. They also assert termination of the mother's rights is in S.M.'s best interests. They rely on the fact that S.M. has been in their full-time care since she was just over one year old and the mother cannot properly care for S.M.[13]

Iowa Code section 600A.8(3)(b)(1)–(3) governs the standard for termination when the petitioners are alleging the parent abandoned the child; it states:

> The juvenile court shall base its findings and order under section 600A.9 on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights:
> . . . .
> 3. The parent has abandoned the child. For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:
> . . . .
> b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and

---

[13] The guardians also assert the juvenile court declined to terminate the father's rights because it assumed the father would be able to regain custody of S.M., presumably by successfully terminating the guardianship. The inference the guardians are now making was quite properly not an issue before the district court on this petition, given guardianship proceedings are entirely separate from termination proceedings. *Compare* Iowa Code § 600A.8 (governing the termination of parental rights brought pursuant to a petition filed by an individual), *with id.* § 633.675 (governing guardianship proceedings). Consequently, the district court did not rule on this issue, and we will not address it now on appeal. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) (holding error is not preserved if the issue is not properly presented before the district court).

financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Case law further counsels the two elements needed to establish abandonment are the giving up of parental rights and responsibilities accompanied with the intent to abandon the child. *C.A.V.*, 787 N.W.2d at 101.

## A. The Father

We agree with the juvenile court the guardians failed to prove the father abandoned the child, pursuant to the requirements of Iowa Code section 600A.8(3)(b). As an initial matter, it is uncontested the father regularly paid his court-ordered child support of $60 per week. As of the time of the termination hearing, he was not in arrears, and therefore, he has contributed "toward support of the child of a reasonable amount." *See id.* § 600A.8(3)(b); *see also In re D.E.E.*, 472 N.W.2d 628, 630 (Iowa Ct. App. 1991) (noting if the petitioner fails to prove the parent did not support the child without good cause, that alone is enough to conclude the parent's rights should not be terminated).

Furthermore, the father, although somewhat sporadically, exercised visitation with S.M. His contact, though not monthly while he lived in Chicago, was consistent. It was undisputed he called S.M. during times in which he did not physically visit. Additionally, the primary reason for his lack of greater visitation is the distance he must travel. At the termination hearing, he stated:

I feel that the steps that I've done is to, yes, I have taken some promotions, and obviously, yes, I have made work a priority, but

I've always had my daughters[14] in mind with that. Whether I was living here in Dubuque, I feel working three jobs, working seven days a week, and I really feel that since I have promoted myself, and yes, I have, I had to move a little bit farther away, I have been able to spend more time with my daughters.

It is also in the best interests of S.M. that the father's rights not be terminated. The record established S.M. and the father shared a bond. While he has clearly relinquished the day-to-day care of S.M. to the guardians, and been satisfied with her placement, he has not removed himself from S.M.'s life so as to break that bond.

We do note that the GAL's observation the father did not do nearly as much as he could to meaningfully parent S.M. has merit. A great deal of the father's visitation was taken up with the father's mother caring for S.M. It is also apparent from the record the father visited S.M. when it was convenient for him and his employment, irrespective of S.M.'s need to have her father present. Additionally, the father—given his increased income over the years—could have contributed more to S.M.'s physical care and maintenance. According to the guardian-grandfather, instead of voluntarily contributing to S.M.'s support, the father asked whether the guardians were "going to turn him into child support because he's making more money."

However, these shortcomings do not satisfy the requirements of abandonment within the meaning of Iowa Code section 600A.8(3)(b). As noted above, the record establishes the father satisfied his child support obligation and has maintained contact with S.M. *See D.E.E.*, 472 N.W.2d at 630–31

---

[14] The father has another daughter by another mother. The two girls have a good relationship and consistent contact with each other.

(concluding the father's rights should not be terminated because he did not fail to support the child without good cause and it was not in the child's best interests that the father's rights be terminated). Consequently, we agree with the juvenile court's conclusion the guardians failed to prove by clear and convincing evidence the father's parental rights to S.M. be terminated pursuant to Iowa Code section 600A.8(3)(b).

**B. The Mother**

The juvenile court concluded the mother abandoned S.M. within the meaning of Iowa Code section 600A.8(3)(b) and (4). The record supports this conclusion. Consequently, we affirm this portion of the court's order. However, the court stopped short of ordering termination of her rights, finding:

> Petitioners have not established any ground to terminate father's parental rights by clear and convincing evidence. Without terminating the parental rights of both parents, the Petitioners are statutorily unable to proceed with an adoption of the child. (§ 600.3(2)(a)). Additionally, terminating only the parental rights of mother will have no impact upon their decision-making authority over the child as guardians. The Petitioners will continue to have the authority to set appropriate parameters as to the contact between the parents and the child. Although mother has done essentially nothing to put herself into a position to care for the child on a full-time basis, mother continues to have visitation with the child which has now increased to approximately one time per week. The child identifies her as her mother and visits, for the most part, go well and a bond between the mother and child has been observed. Under these circumstances, the Court is unable to determine that termination of mother's parental rights would be in the best interests of the child.

We agree with these observations and findings. Consequently, we affirm the juvenile court's dismissal of the petition for termination of both the mother's and father's parental rights.

**AFFIRMED.**