# IN THE COURT OF APPEALS OF IOWA

No. 22-1599
Filed January 10, 2024

**SCOTT HAMPE,**
        Plaintiff-Appellant,

**vs.**

**CHARLES GABUS MOTORS, INC. d/b/a TOYOTA OF DES MOINES, and GADIMINA ENTERPRISES, INC. d/b/a MID-IOWA OCCUPATIONAL TESTING,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Joseph Seidlin, Judge.

        An employee appeals the entry of summary judgment on his claims under Iowa Code section 730.5 (2019).  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

        Matthew M. Sahag and Gary Dickey of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

        Andrew Tice of Ahlers & Cooney, P.C., Des Moines, for appellee Charles Gabus Motors, Inc. d/b/a Toyota of Des Moines.

        Margaret A. Hanson and Katelynn T. McCollough of Dentons Davis Brown P.C., Des Moines, for appellee Gadimina Enterprises, inc. d/b/a Mid-Iowa Occupational Testing.

        Heard by Tabor, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Iowa Code section 730.5 (2019) provides a "detailed and comprehensive statutory scheme" for private employers who choose to wade into the controversial area of workplace drug testing. *Dix v. Casey's Gen. Stores, Inc.*, 961 N.W.2d 671, 678 (Iowa 2021). But, as this case shows, the devil is in those details.

Scott Hampe sued his former employer, Charles Gabus Motors, Inc. (Gabus),[1] and its testing service, Mid-Iowa Occupational Testing (Mid-Iowa),[2] for numerous violations of section 730.5 after he was terminated for refusing to provide a drug test. Because we find that genuine issues of material fact preclude summary judgment on some of Hampe's statutory claims against Gabus only, we affirm in part, reverse in part, and remand.

## I.   Background Facts and Proceedings

In the close to fourteen years that Hampe was employed by Gabus, he was one of the company's most successful salespeople. He began working in sales for Gabus in 2006, eventually transitioning into a leasing manager position. In 2008, Hampe signed an agreement to abide by Gabus's controlled substance policy and submit to drug testing. Over the next years of his employment, Hampe signed acknowledgments that he received and understood updated versions of Gabus's employee handbook, which contained provisions about the company's drug testing program. The most recent version that Hampe acknowledged receiving was from September 2019.

---

[1] Doing business as Toyota of Des Moines.
[2] Mid-Iowa's legal name is Gadimina Enterprises, Inc.

The testing provision in that handbook advised Gabus's employees that "[r]andom drug and alcohol testing will be done monthly" and would be "compliant with the requirements of Iowa Code section 730.5." The handbook stated all testing would be done by Mid-Iowa "or another provider, selected by the Company, who is compliant with the requirements of Iowa Code [s]ection 730.5, including maintaining a Medical Review Officer." The "Disciplinary Action" part of the policy noted that violations, which included "refusal to consent to and comply with testing," could result in suspension with or without pay, termination, refusal to hire, rehabilitation, or "[o]ther adverse employment action in conformance with [Gabus's] written policy and procedures."

Kelsey Gabus-McBride, the human resources director for Gabus since 2016, oversees the company's drug-testing policy and procedures. She decided to schedule a random employee drug test on December 5, 2019, with the goal of testing fifteen employees. She contacted Mid-Iowa, which had a master list of Gabus's employees in its database from past testings, for its assistance. According to Gabus-McBride, all active employees were within the pool to potentially be tested. She did not take any steps to determine which employees were not scheduled to be at work the day of the testing. Mid-Iowa ran Gabus's employee list through a computer-based random number generator to select the individuals to be tested. That list, which was generated on November 27, included fifteen individuals to be tested and eight alternates. Hampe was the last name on the alternate list.

The morning of the test, Gabus-McBride notified department managers which employees were on the list "and asked employees be contacted one-by-one

to report to the dealership's lunchroom for testing." If an employee wasn't present—due to leave, not being scheduled to work, or being scheduled but not present—then Gabus-McBride said the manager was to move to the next employee on the list. As to being scheduled but not present, Gabus-McBride explained some employees had duties that may have taken them away from the worksite, like parts drivers. Those individuals would not have been contacted and told to report to the worksite for testing. The initial list was to be exhausted before moving onto the alternates. In all, six individuals from the initial list and seven individuals from the alternate list, including Hampe, were drug tested.

Hampe was scheduled to work on December 5, the day of the testing. Before going into work, he played basketball and worked out. Hampe had an appointment at 9:00 a.m. with some customers, but because his thirteen-year-old daughter was home sick from school, he planned to head back home after the appointment to take her to urgent care. But when he got to work at 9:00 a.m., Hampe's manager called him and told him that he "need[ed] to go upstairs for a drug test." Hampe finished his appointment, which took about thirty minutes, and then went to the testing area.

Once there, he took a seat and waited for his turn. Mid-Iowa employee Sarah Ghee "was present onsite . . . to assist with sample collection" and "'monitored' sample collection for all employees tested that day." Gabus-McBride was also present in the testing area. When Ghee was ready for Hampe, she handed him a cup and accompanied him into the bathroom being used as the collection site. The bathroom had a private stall and common-area sink. Ghee waited by the sink while Hampe went into the stall. In his deposition, Hampe

explained that because the stall was small, "you can't really stand and pee and then shut the door." So he left the door open while he urinated into the cup.

When Hampe was finished, he handed the cup to Ghee. She shot it "with a laser gun and [said] it's out of temperature. And then tells me that I'm going to have to drink more water and come back and then dumps it out" into the sink. Hampe saw that the temperature registered at 101 degrees, although in a statement written by Ghee, she said it was 104 degrees and "neon in color . . . like Mountain Dew." Hampe did not recall Ghee mentioning any concerns about the color of the urine, and the only notation she made on Mid-Iowa's testing form was "out of temp at 9:45 at 104." Hampe sat in the waiting area for about ten minutes before he tried again. But Ghee dumped that one out too because he didn't produce enough urine.

Hampe returned to the waiting area and drank more water. After about twenty minutes, he told Gabus-McBride that he had to go home because his daughter was sick. Gabus-McBride told him, "You know if you leave, you're going to get fired." When Hampe asked whether she would "really do that," Gabus-McBride said, "Yeah." So Hampe sat back down for another fifteen minutes, "trying to weigh [his] options." He eventually decided to leave, though he told Gabus-McBride that he would come back. She repeated, "No. If you leave, you're fired." Hampe responded, "I shouldn't even be up here anyhow because my name's not on the list." And then he left.

Later that day, at 11:59 a.m., Hampe emailed Dee Kading, the president of Gabus, offering to "go to the facility or come back" to test. Kading replied, "You have worked for the Toyota dealership long enough to know the rules. I wish you

the best." Gabus then terminated Hampe from his employment, noting in a "notice of employment termination" that the reason was his "refus[al] to complete random drug test." Hampe did go to Mid-Iowa's facility the next day, where he requested and paid for a second test. That test was observed by a male employee and was negative.

In May 2020, Hampe sued Gabus and Mid-Iowa, alleging both failed to carry out the December 2019 drug test in compliance with Iowa Code section 730.5. In an amended petition, Hampe added common-law claims of fraud, invasion of privacy, conspiracy, and reckless disregard, all arising out of the drug testing.

In March 2022, both defendants filed motions for summary judgment. In its motion and supporting brief, Gabus argued Hampe was not an aggrieved employee within the meaning of the statute because he was terminated for ignoring Gabus-McBride's "directive not to leave the workplace," not for his "two insufficient urine specimens." Next, Gabus argued it was statutorily immune from liability for any alleged violations by Mid-Iowa. To the extent any such violations could be attributed to Gabus, the company argued that it substantially complied with the statute. As to the common-law claims, Gabus argued that "section 730.5 is the exclusive remedy for causes of action in Iowa relating to private employer workplace drug testing."

For Mid-Iowa's motion for summary judgment, the testing service generally argued it performed the drug test "in substantial compliance with Iowa law and pursuant to industry standards." Mid-Iowa also asserted that it did not aid Gabus in violating the statute, and it had no control over how Gabus acted in relation to the alleged violations. Finally, Mid-Iowa contended that the common-law claims

were "merely shallow restatements of [Hampe's section] 730.5 claim . . . and fail for the same reason[s]."

Hampe resisted summary judgment, initially addressing only his allegations under section 730.5. Those allegations included claims that both defendants violated section 730.5(8)(a) in the selection process used to determine which employees would be tested; section 730.5(9)(h), governing supervisory training; section 730.5(9)(b), requiring written policies with uniform disciplinary or rehabilitative actions; section 730.5(7)(a), (b), and (h), regarding Hampe's complaints about a female observing him, her handling of the specimens he provided, and the failure to submit them to a medical review officer; and section 730.5(9)(a)(1), requiring that testing be conducted within the terms of the employer's written policy.[3] He also moved for partial summary judgment "as to liability only for his section 730.5 claim," contending the defendants were liable for the alleged violations as a matter of law. Shortly before the hearing on the motions for summary judgment, Hampe filed a supplemental resistance addressing his common-law claims.

Following a hearing in July, the district court granted both defendants' motions for summary judgment on the various ways Hampe claimed they violated section 730.5. Addressing each claimed violation separately, the court found that either the specific provision had not been violated, Hampe was not aggrieved, or Gabus was immune. As to the common-law claims, the court found Hampe's supplemental resistance addressing those claims was untimely and declined to

---

[3] Hampe also raised a claim under section 730.5(7)(c)(2), which he does not repeat on appeal.

consider it. In any event, the court found that because the claims were based on the same allegations as the section 730.5 claims, that statute provided Hampe with his exclusive remedy. As a result, the court granted the defendants' motions for summary judgment in their entirety, denied Hampe's motion for partial summary judgment, and dismissed the suit with prejudice. Hampe appeals.

## II.     Standard of Review

"The standard of review for district court rulings on summary judgment is for correction of errors of law." *Kunde v. Est. of Bowman*, 920 N.W.2d 803, 806 (Iowa 2018). Summary judgment is appropriate only when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "In determining whether a grant of summary judgment was appropriate, we examine the record in the light most favorable to the nonmoving party, drawing all legitimate inferences that may be drawn from the evidence in his or her favor." *Homan v. Branstad*, 887 N.W.2d 153, 163–64 (Iowa 2016). "Where reasonable minds can differ on how an issue should be resolved, a fact question has been generated, and summary judgment should not be granted." *GreatAm. Fin. Servs. Corp. v. Natalya Rodionova Med. Care, P.C.*, 956 N.W.2d 148, 153 (Iowa 2021) (citation omitted).

## III.     Analysis

Section 730.5 "governs workplace drug testing of employees and potential employees." *Dix*, 961 N.W.2d at 681. An employer must follow the statute's detailed scheme if it wants to utilize drug testing in the workplace. *Id.* The court has "described section 730.5 as providing 'severely circumscribed conditions

designed to ensure accurate testing and to protect employees from unfair and unwarranted discipline.'" *Id.* (citation omitted).

Yet claims under the statute "should be evaluated using a substantial compliance standard." *Id.* at 682. "Thus, if the employer's actions fall short of strict compliance, but nonetheless accomplish the important objectives expressed by the particular part of section 730.5 in issue, the employer's conduct will substantially comply with the statute." *Id.* (cleaned up). Our supreme court has also recognized that "not every violation results in liability" because section 730.15(a)(1) "only makes the employer 'liable to an *aggrieved* employee.'" *Id.* at 692 (citation omitted).

The question in this appeal is whether the court's grant of summary judgment upon Hampe's various claims under section 730.5 and his common-law claims "was a correct application of the law based on the undisputed facts in the record." *Tow v. Truck Country of Iowa, Inc.*, 695 N.W.2d 36, 38 (Iowa 2005). Turning to that question, we address Hampe's claims in the order he raises them.

### A.    Statutory Immunity

Hampe first claims summary judgment based on statutory immunity under Iowa Code section 730.5(11)(a)[4] was improper. He submits "statutory immunity

---

[4] This provision states:

> A cause of action shall not arise against an employer who has established a policy and initiated a testing program in accordance with the testing and policy safeguards provided for under this section, for any of the following:
> a. Testing or taking action based on the results of a positive drug or alcohol result, indicating the presence of drugs or alcohol, in good faith, or on the refusal of an employee or prospective employee to submit to a drug or alcohol test.

Iowa Code § 730.5(11)(a).

does not apply because [his] cause of action is brought pursuant to Iowa Code section 730.5(15)," which imposes liability upon "[a] person who violates this section *or who aids in the violation of this section*." (Emphasis added.); *accord Dix*, 961 N.W.2d at 683–84 (noting "[s]ubsection (11) must be read in conjunction with subsection (15)" and concluding the "immunity provided by subsection (11) does not apply to civil actions under subsection (15)(a) alleging the employer violated section 730.5"). Because Hampe claims Gabus and Mid-Iowa "acted in concert for the entire scope of the" drug test, he thinks neither can be immune from the other's actions and both are liable for each of his claims.

The district court, however, justified summary judgment based on immunity in just one context for Gabus only—Hampe's testing procedure claims under section 730.5(7)(a), (b), and (h) due to Mid-Iowa's specimen collector being a female and her handling and non-submission of the specimens provided by Hampe. *See Dix*, 961 N.W.2d at 684 (acknowledging a defendant could be immune under Iowa Code section 730.5(11)(a) for "claims premised on third-party conduct"). And even Hampe's brief attributes certain actions to only one of the defendants, while other claims assign fault to both. We accordingly limit Hampe's immunity complaint to the claimed violations of section 730.5(7)(a), (b), and (h), which we reach later in the opinion. For the rest of the claimed violations, we will address them as framed by Hampe and decided by the district court.

**B.      Section 730.5(1)(*l*)—Neutral and Objective Selection**

Seizing on an issue left open in *Dix*, Hampe claims both defendants "violated Iowa Code [s]ection 730.5(1)(*l*)'s neutral-and-objective-selection requirement by using an alternate system to exempt nine employees from

testing."[5] 961 N.W.2d at 691–92 (declining to address issue because challenging employees were not on alternate list and therefore not aggrieved). Hampe argues the statute does not authorize the use of an alternate list and its use violates the requirement that selection be neutral and objective.

While Hampe made some of these same arguments in district court, they were not raised under section 730.5(1)(*l*) but under section 730.5(8)(a), which we discuss next. And the district court did not mention either section 730.5(1)(*l*) or Hampe's arguments about the use of an alternate list, instead confining its analysis to the composition of the pool from which employees were selected for testing under section 730.5(8)(a). We accordingly agree with the defendants that error was not preserved on this claim. *Cf. Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("Where the trial court's ruling . . . expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error.").

## C.    Section 730.5(8)(a)—Testing Pool

Moving on to Hampe's complaints about the testing pool, he argues summary judgment was inappropriate because Gabus "failed to substantially comply with Iowa Code section 730.5(8)([a]) by intentionally making no effort to

---

[5] Section 730.5(1)(*l*) requires unannounced testing to
> be done based on a neutral and objective selection process by an entity independent from the employer and shall be made by a computer-based random number generator . . . in which each member of the employee population subject to testing has an equal chance of selection for initial testing, regardless of whether the employee has been selected or tested previously.

determine whether employees included in the testing pool were scheduled to be at work at the time of the test."[6]

"Employers may conduct unannounced drug or alcohol testing of employees who are selected from" one of three pools of employees, only one of which is at issue here—the entire population at a work site. Iowa Code § 730.5(8)(a)(1). For that category, however, the population does not include "employees who are not scheduled to be at work at the time the testing is conducted because of the status of the employees or who have been excused from work pursuant to the employer's work policy prior to the time the testing is announced to employees." *Id.*

Hampe argues that because Gabus "made no effort to determine what employees were scheduled to be at work at the time of the test" when formulating a testing pool, it did not substantially comply with the statute. Gabus-McBride agreed the testing pool included all active employees at the work site, regardless of whether any employee was scheduled to be at work. And that master list was compiled sometime before Mid-Iowa generated the random testing list on November 27, 2019, with Gabus-McBride testifying in a deposition: "At the time of Mr. Hampe's test, it was in their database."

---

[6] While Hampe includes Mid-Iowa in this alleged violation on appeal, the district court confined its analysis to Gabus. Because the court did not address whether Mid-Iowa violated this provision, we will not do so on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). In any event, Hampe does not explain how Mid-Iowa aided Gabus in identifying the employees to be included in the pool from which Mid-Iowa used its computer-based random number generator to select employees for testing. *See* Iowa Code § 730.5(1)(*l*).

Yet Gabus argues that, like the employer in *Dix*, it substantially complied with section 730.5(8)(a) even though its testing pool was "not perfect." The court in *Dix* did state that "[w]ith respect to providing an accurate list of employees scheduled to work on the day of testing, we agree with the district court that substantial compliance allows some give in compiling the list for the selection process" and room for human error. 961 N.W.2d at 690. As a result, the court found substantial compliance with section 730.5(8)(a) where, on the day of testing, some employees were sick, no-showed, or made leave requests between the employer's compilation of the list and provision of the list to its third-party testing vendor. *Id.* at 691. But there's an important difference between this case and *Dix*. On the day before the scheduled testing in *Dix*, the employer provided its outside vendor with a list of employees "*who were scheduled to work*" the next day. *Id.* at 679 (emphasis added). Here, Gabus just included *all* of its employees in the testing pool, admittedly making no effort to determine who was "scheduled to be at work at the time the testing is conducted." Iowa Code § 730.5(8)(a)(1).

Still, Gabus contends it substantially complied with section 730.5(8)(a) because "its actions met the intent of its provisions"—to prevent employers "from targeting or exempting specific employees for drug tests." *Dix*, 961 N.W.2d at 689. But by including all employees in the testing pool, Gabus *did* exempt specific employees from testing by skipping those who had been randomly selected but were not present at work for whatever reason. Further, while Gabus suggests another purpose of the testing pool parameters is to ensure employees are paid for testing and not called in outside their normal work period, *see* Iowa Code

§ 730.5(6)(a),[7] that did not happen in Gabus's implementation of its testing program. The undisputed facts show that the month before the disputed test in this case, Hampe was called in to work to test on his day off, leading to his belief that he was being targeted by Gabus when he was selected for testing again in December. For these reasons, we agree with Hampe that there is a genuine issue of material fact on whether Gabus substantially complied with the statute.

That said, liability only extends "to an aggrieved employee." Iowa Code § 730.5(15)(a)(1). Gabus argues Hampe was not aggrieved "because the greater number of people on the list makes it less likely that a particular person would be randomly selected." And Hampe was scheduled to work on the testing day anyway, so he would have been in the testing pool even if Gabus strictly followed the statute.

While there is some logic to these arguments, we must view the record in the light most favorable to Hampe, which shows that he was the last person on the alternate list and multiple employees higher up on the list were absent. Six employees on the initial list and one on the alternate list never clocked in, so we can reasonably infer they were not scheduled to work that day. *See Homan*, 887 N.W.2d at 164 (affording the non-moving party "all legitimate inferences that may be drawn from the evidence in his or her favor"). A seventh employee did not clock in until around noon, when the testing started first thing in the morning.[8]

---

[7] Section 730.5(6)(a) requires workplace drug testing to "normally occur during, or immediately before or after, a regular work period. The time required for such testing by an employer shall be deemed work time for the purposes of compensation and benefits for employees."

[8] We note that two other employees on the initial list were at work but not tested. Those employees punched in before 7:00 a.m. on the testing day. Gabus-McBride

Had Gabus limited its pool to scheduled employees, it's possible Hampe would never have been tested. *See Dix*, 961 N.W.2d at 689 (finding employees "were aggrieved by losing their jobs because they should never have been tested"). Because we find genuine issues of material fact remain on this claim, we reverse summary judgment and remand for further proceedings on this claim as to Gabus only.

### D.    Section 730.5(9)(h)—Supervisor Training Requirements

Hampe next claims Gabus "failed to substantially comply with Iowa Code section 730.5(9)(h) because the only supervisor involved in testing failed to complete required initial training and annual training."[9]    The relevant statutory provision provides:

> In order to conduct drug or alcohol testing under this section, an employer shall require supervisory personnel of the employer involved with drug or alcohol testing under this section to attend a minimum of two hours of initial training and to attend, on an annual basis thereafter, a minimum of one hour of subsequent training. The training shall include, but is not limited to, information concerning the recognition of evidence of employee alcohol and other drug abuse, the documentation and corroboration of employee alcohol and other drug abuse, and the referral of employees who abuse alcohol or other drugs to the employee assistance program or to the resource

---

explained they were parts drivers and may have been off-site somewhere. But she made no effort to locate them or have them come in for testing.

[9] Like the preceding claim, the district court only applied this claim to Gabus. *See Meier*, 641 N.W.2d at 537.  And again, Hampe has not explained on appeal how Mid-Iowa aided Gabus in its inadequate supervisor training.  We accordingly confine our analysis to Gabus.

file maintained by the employer pursuant to paragraph "c", subparagraph (2).

Iowa Code § 730.5(9)(h). Hampe argues Gabus violated this provision because Gabus-McBride[10] never completed any initial training, and the content of her annual training was non-compliant "because it did not include training on the documentation and corroboration of employee drug abuse or referral of employees who abuse drugs."

In an affidavit, Gabus-McBride stated that she completed two-hour "Reasonable Suspicion Supervisory Trainings" annually between 2016 and 2021. The record, however, shows her initial training in 2016 when she became the human resources director was only sixty minutes. That training "covered the physical, behavioral, speech, and performance indicators of probable alcohol misuse and controlled substance use or abuse." Her trainings in 2017 and 2018 were two hours, and her training in 2019 was one hour. All of them were on the same topic as the first. None of the certificates for these trainings mentioned the two other topics required by the statute. While Gabus-McBride stated that she received other training from her predecessor, we agree with Hampe that there is a genuine issue of material fact about whether Gabus substantially complied with the training requirement. That fact question also leads to a genuine issue of material fact on whether Hampe was aggrieved. That's because if Gabus did not substantially comply with section 730.5(9)(h), then the testing was not statutorily authorized and Hampe would not have lost his job but for the illegal test. *See id.*

---

[10] The adequacy of Gabus-McBride's training has been raised before, but error on the claim was not preserved. *See Woods v. Charles Gabus Ford, Inc.*, 962 N.W.2d 1, 5–6 (Iowa 2021).

(stating that "*[i]n order to conduct drug or alcohol testing under this section*, an employer shall require supervisory personnel of the employer involved with" the testing to attend specific training (emphasis added)); *Dix*, 961 N.W.2d at 689. We according reverse and remand this claim as to Gabus only.

### E.     Section 730.5(7)—Submission Requirements

Hampe next claims the defendants "failed to substantially comply with Iowa Code section 730.5(7) because they destroyed evidence of [his] urine specimens at the testing site and did not send the results to a certified laboratory for initial confirmatory testing or for review by a medical review officer." Relying on an expert report submitted by Mid-Iowa in support of its summary judgment motion, the district court found Hampe "presented no evidence explaining how the urine he supplied could have been validly tested for the presence of drugs. The only evidence before the court is that it could not."

For the reasons below, we agree with the court that summary judgment on this claim was proper, though we base that conclusion on a different ground—that Hampe was not aggrieved by any violation of this section. *See Meier*, 641 N.W.2d at 540 n.1 ("A prevailing party may support the district court judgment on any ground contained in the record . . . ."). As a result, we need not decide whether the court also correctly concluded that Gabus was immune from liability for any violations of section 730.5(7).

Section 730.5(7) governs "[t]esting procedures" and provides "[a]ll sample collection and testing for drugs or alcohol under this section shall be performed in accordance with the following conditions." A "sample" collected for testing must be "split into two components at the time of collection in the presence of the

individual from whom the sample is collected," and "[b]oth portions of the sample shall be forwarded to the laboratory conducting the initial confirmatory testing." *Id.* § 730.5(7)(b). Confirmatory testing must be done in certain laboratories, and confirmed positives must be reviewed and interpreted by a medical review officer before the results are reported to the employer. *Id.* § 730.5(7)(f), (h). If the employer receives a report of a confirmed positive, it must notify the employee of the results and his or her "right to request and obtain a confirmatory test of the second sample collected pursuant to paragraph 'b.'" *Id.* § 730.5(j)(1).

Mid-Iowa contends that it was not required to follow these testing procedures because Hampe's specimens did not meet the statutory definition of a "sample." Section 730.5(1)(k) defines that term to mean "such sample from the human body capable of revealing the presence of alcohol or other drugs, or their metabolites." Mid-Iowa's argument is based on a report from certified medical review officer Dr. Charlton Owensby, who stated the two specimens Hampe provided were not "samples" under section 730.5(1)(k) because the first exceeded the allowable temperature range of "90°–100° F" and the second was an insufficient amount to test. These flaws made the samples not "*reliably* capable of revealing" the presence of drugs or their metabolites, according to Dr. Owensby. (Emphasis added.) He explained that any specimen exceeding 100 degrees provided by a healthy donor "is likely substituted or adulterated and therefore incapable of reliably revealing the presence of alcohol or other drugs" and "should not be sent for testing." *Cf.* 49 C.F.R. § 40.65(b)(6) (stating that for drug-testing in industries subject to the authority of the United States Department of Transportation, the collector must "process both the original" out-of-temperature

"specimen and the specimen collected using direct observation . . . and send the two sets of specimens to their respective laboratories").

Setting aside whether this definition of sample—with its added temperature-range requirements and qualifier of "reliably"—adheres to our more limited statutory definition, we find the undisputed facts show that Hampe was not aggrieved by the claimed violations of section 730.5(7). Hampe argues that he was aggrieved because the "destruction of [his] urine samples before confirmatory testing took place violated his right to ensure an accurate testing process" and left him with "no way to know what the outcome of the" tests would have been. But as Mid-Iowa points out, Hampe was given two "additional opportunities to give a testable urine sample—the latter of which he refused." Had Hampe stayed to provide another sample, as requested, that procedure could have been followed. *See Dix*, 961 N.W.2d at 692 ("Determining whether an employee is aggrieved necessarily depends on the nature of the violation."). We accordingly affirm the district court on this point.

**F.      Section 730.5(7)(a)—Gender of Monitor or Observer**

Next, Hampe claims the defendants did not "substantially comply with Iowa Code [section] 730.5[(7)(a)] because a female directly monitored the collection of [his] urine specimens." Section 730.5(7)(a) provides that if collection of a "urine sample is directly monitored or observed by another individual, the individual who is directly monitoring or observing the collection shall be of the same gender as the individual from whom the . . . urine sample is being collected." We again decide this claim adversely to Hampe because he made only a general claim of harm to his privacy interest, arguing "it was embarrassing to have Ghee monitor him." That

is not enough to show that he was aggrieved. *See id.* at 694 ("General claims of harm to their privacy interests do not suffice.").

## G. Section 730.5(9)(b)—Uniform Disciplinary Policy

This brings us to Hampe's claim that Gabus "failed to substantially comply with Iowa Code section 730.5(9)(b) because [Gabus's] drug testing policy did not provide for uniform disciplinary actions."[11] Section 730.5(9)(b) provides:

> The employer's written policy shall provide uniform requirements for what disciplinary or rehabilitative actions an employer shall take against an employee or prospective employee upon receipt of a confirmed positive test result for drugs or alcohol or upon the refusal of the employee or prospective employee to provide a testing sample. The policy shall provide that any action taken against an employee or prospective employee shall be based only on the results of the drug or alcohol test.

While Hampe acknowledges that the court examined how the policy was applied, he contends it failed to examine the plain language of the policy. Because the policy allowed discretion in the level of discipline, Hampe argues it violated the statute.

The version of the employee handbook that took effect in September 2019 provided the following "Disciplinary Action" provision for drug testing:

> Employees who violate this policy *may be* disciplined or terminated. Violations include refusal to consent to and comply with testing and search procedures as described. Upon receipt of a confirmed positive test result for drugs or alcohol or upon the refusal of the employee or prospective employee to provide a testing sample, any action taken against an employee or prospective employee shall be based only on the results of the drug or alcohol test. Refusal of an employee or prospective employee to submit to a drug or alcohol test

---

[11] While Hampe's brief includes Mid-Iowa in this claimed violation, he once more fails to explain how Mid-Iowa could be viewed as having aided Gabus in failing to have uniform requirements in Gabus's written policy for disciplinary actions. And the district court again decided this claim only as to Gabus. We follow suit. *See Meier*, 641 N.W.2d at 537.

or respond to the Medical Review Officer, submittal of a sample that does not belong to the tested employee, and/or tampering with or altering a sample will be deemed as a positive test result in violation of this policy. The Company *may take* the following actions:

(1) Suspension of the employee, with or without pay, for a designated period of time. . . .

(2) Termination of employment.

(3) Refusal to hire a prospective employee.

(4) Other adverse employment action in conformance with the Company's written policy and procedures.

(5) Rehabilitation as described below.

(Emphasis added.)

This policy provides Gabus with discretion to select different adverse employment actions upon a violation. While the district court implicitly agreed with that point, it granted summary judgment because Hampe failed to show other employees were treated differently under the policy. So the court found there were "no issues of material fact regarding any failure to comply with Iowa Code section 730.5(9)(b)."

We agree with Hampe that summary judgment was improper on this claim based on substantial compliance. The handbook policy clearly provides Gabus with discretion to choose among different adverse employment actions,[12] while the statute requires uniform requirements for what actions the employer "shall" take. *See McVey v. Nat'l Org. Serv., Inc.*, 719 N.W.2d 801, 803–04 (Iowa 2006) ("We further agree that it is essential the employee drug-testing policy, as formulated by the employer, contain uniform requirements for what disciplinary or rehabilitation actions an employer shall take against an employee or prospective employee upon

---

[12] Unlike the updated employee handbook, the controlled-substances policy that Hampe signed in 2008 did mandate termination for test refusal. But Gabus-McBride testified both policies were in effect at the time of Hampe's test, further rendering the applicable disciplinary actions non-uniform.

receipt of a confirmed positive drug test."). One of the main purposes of section 730.5 is to prevent targeting or exempting employees. *See Dix*, 961 N.W.2d at 659. Allowing an employer discretion in discipline gives the employer the ability to both target certain employees for and exempt certain employees from adverse employment action.

We also find a question of fact as to whether Hampe was aggrieved by this violation. Hampe presented affidavits from two employees who were tested the same day he was—Steven Fowler and Marcy Davis. Fowler's affidavit stated that during his test, "the collector accused [him] of having a diluted sample." He offered to provide "another sample immediately, and she responded by saying no and said I passed the test." Davis's affidavit related that when she provided the collector with her urine, "she looked at it, and then informed me that she found THC in my urine sample." Davis "immediately disputed" that result and "told her that what she was saying was not true. [The collector] responded and said that she would normally send it for further testing, but that she would let it go this time." The recorded result for Davis's test was negative. Although Fowler's affidavit did not state whether Gabus was aware of his purported diluted test, Davis said that she did tell her manager at Gabus about her alleged positive test. He responded by asking her if she liked working at Gabus. When she said yes, the manager replied, "then don't worry about it."

While Gabus-McBride testified that employees with testing violations were always terminated, these employees' experiences, when viewed in the light most favorable to Hampe, raise a question of fact as to whether that was truly the case. We accordingly reverse and remand on this claim as to Gabus only.

23

**H.      Section 730.5(9)(a)(1)—Following Terms of Written Policy**

In a catch-all argument, Hampe finally asserts the defendants "failed to substantially comply with Iowa Code section 730.5(9)(a)(1) because they did not carry out the drug test within the terms of [Gabus's] written policy."[13]  That written policy, contained in Gabus's 2019 employee handbook, simply provided that all testing would be done by Mid-Iowa and comply with section 730.5.  The ways Hampe claims Gabus violated its written policy are repetitive of the ones that he raised under section 730.5(7).  Because we found Hampe was not aggrieved by any of those violations, we reach the same conclusion here and affirm the district court's grant of summary judgment on this claim.

**I.      Common-Law Claims**

Finally, Hampe contends summary judgment on his common-law claims was error.  He argues the court erred in determining his resistance to summary judgment on these claims was untimely, the defendants are not immune, and fact issues remain.  But all the common-law claims stem from the defendants' alleged violations of section 730.5.  The law is clear that "the civil cause of action provided by Iowa Code section 730.5 is the exclusive remedy for a violation of section 730.5."  *Ferguson v. Exhide Techs., Inc.*, 936 N.W.2d 429, 436 (Iowa 2019).  We accordingly conclude summary judgment on these claims was proper.

---

[13] Section 730.5(9)(a)(1) provides: "Drug or alcohol testing or retesting by an employer shall be carried out within the terms of a written policy which has been provided to every employee subject to testing, and is available for review by employees and prospective employees."

**IV.    Conclusion**

In sum, we affirm the entry of summary judgment for Mid-Iowa on all claims raised by Hampe.  As to Gabus, we affirm summary judgment on all claims except the claims that Gabus violated the testing pool requirements of section 730.5(8)(a), the supervisor training requirements in section 730.5(9)(h), and the uniform disciplinary policy required by section 730.5(9)(b).  We find that genuine issues of material fact remain on those claims, which we remand to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**