# IN THE COURT OF APPEALS OF IOWA

No. 21-1490
Filed May 7, 2025

**DAVID JOSEPH MOFFITT,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

An applicant convicted of first-degree murder and first-degree burglary appeals the denial of postconviction relief. **AFFIRMED.**

David Joseph Moffitt, self-represented, and Daniel M. Northfield (until withdrawal), Urbandale, for appellant.

Brenna Bird, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee State.

Considered without oral argument by Greer, P.J., Langholz, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**VOGEL, Senior Judge.**

After David Moffitt killed his ex-girlfriend's new fiancé—breaking into his home and shooting him point blank in the head four times as he slept—Moffitt was convicted of first-degree murder and first-degree burglary. Following an unsuccessful direct appeal, he applied for postconviction relief, arguing his trial counsel was ineffective for failing to pursue a diminished-responsibility defense. Finding no breach of duty by counsel, we affirm.

## I.   Factual Background and Proceedings.

Around March 2013, Moffitt began dating a woman, Angie. The relationship only lasted a few months, and Angie ended things after she met another man in June—Justin Michael. Moffitt did not accept Angie's rejection, asking to continue the relationship and sending her a profane text message. Meanwhile, Angie and Michael's relationship quickly became serious. In August, Moffitt started working in a new position, joining the same team as Michael. The proximity to Michael became difficult for Moffitt, especially when Michael announced his engagement to Angie at work. Moffitt was so upset by the engagement that he was sent home for the day, and his employment later ended.

In 2014, Moffitt began plotting Michael's murder. He bought a Hi-Point rifle, a red-dot scope, and ammunition using the name of a former boyfriend of Angie's. He researched murder online, using internet searches including "things police look for," "average response time for police in grimes iowa," "traffic cameras in grimes," "the perfect murder," "do homicide detectives look into mental health," and "chances of getting away with murder." He also took handwritten notes after

surveilling the area surrounding Michael's home, noting the nearby creek was "too wide to jump easily" and the "house to the south always has blinds shut."

On May 8, 2014, Moffitt entered Michael's home in the middle of the night. He first encountered Michael's mother, who was visiting from out of town, and kept moving to Michael's bedroom. Moffitt then shot Michael in the head four times as he slept next to Angie. Angie awoke at the shots, saw a person running for the door, and called 911.

Moffitt fled the scene and crashed his car into a telephone pole a few miles away. An off-duty police officer pulled over to assess the crash. Moffitt approached the officer—wearing nothing but shorts—and asked for a ride home. The off-duty officer called the sheriff's office, who sent a deputy to the scene. Moffitt identified himself to the deputy, and the deputy administered a PBT, which showed Moffitt had no alcohol in his system. The deputy called Moffitt a cab, and he was driven home.

Meanwhile, officers were already investigating the murder and decided to search near Moffitt's crashed vehicle. There, they found several rounds of ammunition that matched the shell casings left at the murder scene. Officers also found a shoebox containing shooting earmuffs, an Amazon Kindle showing a map of Grimes, black pants, a laser pointer, mace, and plastic bags. Search warrants executed at Moffitt's home located more incriminating evidence, including his internet search history and the handwritten note.

Moffitt was charged with first-degree murder and first-degree robbery. The case proceeded to an eight-day jury trial in June 2015. The fighting issue at trial was Moffitt's mental state, and he raised an insanity defense. During trial, Moffitt's

expert testified at length about Moffitt's medication history and mental-health status, concluding that Moffitt's medications—Wellbutrin and Trazadone—caused him to have manic episodes and become "completely out of touch with reality." The expert acknowledged that Moffitt admitted during their discussions that he entered Michael's home and intentionally shot Michael four times in the head. Still, Moffitt's expert believed that, at the time of the murder, Moffitt was in a "psychotic obsessed and deluded state" and was "no longer even thinking about right and wrong."

The State's expert countered that Moffitt knew what he was planning was wrong—he repeatedly sought mental-health assistance leading up to the crime, reporting suicidal and homicidal thoughts. After reviewing Moffitt's medical records, the State's expert found no evidence of a delusional mental state or any other evidence suggesting Moffitt was unable "to understand the nature and consequences of his actions."

At the close of evidence, the jury rejected Moffitt's insanity defense and found him guilty as charged. We affirmed his conviction on direct appeal. *See State v. Moffitt*, No. 15-1376, 2017 WL 108282, at *2–5 (Iowa Ct. App. Jan. 11, 2017).

In May 2018, Moffitt applied for postconviction relief (PCR). The application proceeded to trial, where Moffitt argued his trial counsel rendered ineffective assistance by not pursuing diminished-responsibility and intoxication defenses.[1]

---

[1] Moffitt also raised other ineffective-assistance arguments in his application. However, he does not renew those arguments on appeal, so we do not discuss them.

Moffitt argued that his attorney should have pursued those defenses because even if he acted with an "intent to kill," his diminished responsibility or intoxication nevertheless undermined the "willfulness" of his actions.

The PCR court denied his application. In a thorough ruling, the PCR court found "the evidence was overwhelming on the issues of premeditation and deliberation; even [Moffitt's expert] conceded these elements in so many words in his testimony." Even if a diminished-responsibility defense could undermine whether Moffitt acted willfully or knowingly, "a successful application of the defense would still yield a conviction of second degree murder with a mandatory minimum prison sentence of 35 years." What's more, Moffitt could not show prejudice, as his argument overlooked "the felony-murder rule arising from his conviction of burglary in the first degree. The commission of first degree murder as a result of the felony-murder rule is a general intent crime and not subject to the defense of diminished responsibility, unless the underlying offense is a specific intent crime." Because Moffitt did not challenge his burglary conviction, "Moffitt's conviction for first degree murder by way of the felony-murder rule would have been a *fait accompli*. Any use of the diminished responsibility defense would have been futile to avoid a conviction for first degree murder." Thus, Moffitt failed to prove his counsel breached any essential duty or that he was prejudiced.

Moffitt now appeals.[2]

---

[2] This appeal wandered a lengthy path before transfer and submission to our court. The notice of appeal was filed in October 2021. Over the next four years, the case languished as Moffitt hired and then moved to disqualify various attorneys because of alleged dissatisfaction. Between October 2021 and June 2024, Moffitt retained six different lawyers, who together took fourteen briefing extensions and ultimately filed three appellant briefs. After the second amended appellant brief was filed in

**II. Analysis.**

Both the Iowa and United States Constitutions provide criminal defendants with the right to assistance of counsel. Iowa Const. art. I, § 10; U.S. Const. amend. VI. Defendants are deprived of that right when counsel fails to provide effective assistance. *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). To prove ineffective assistance, a defendant must show "both that counsel breached an essential duty and that constitutional prejudice resulted." *Smith v. State*, 7 N.W.3d 723, 726 (Iowa 2024).

Counsel breaches an essential duty by failing to "meet the standard of performance required of a reasonably competent practitioner." *Id.* (cleaned up). The inquiry is demanding—we presume "the attorney acted competently" and will not find constitutionally defective assistance based on mere "[i]mprovident trial strategy, miscalculated tactics or mistakes in judgment." *Id.* (citation omitted). Moreover, even if counsel made one or more unprofessional errors, we will not find prejudice unless a defendant shows "a reasonable probability" that "the result of the proceeding would have been different" but for the error. *Id.* (citation omitted).

June 2024, the State filed its appellee brief in August. Soon after, Moffitt again wanted a new lawyer and a new brief. After being given more time to obtain counsel, and unsuccessfully seeking to again amend his appellant brief, Moffitt ultimately filed his reply brief pro se in January 2025. The appeal was transferred to our court in late February. A week after transfer, and over a month after filing his reply brief, Moffitt moved to file an amended reply brief with yet another new attorney. We denied that motion. Moffitt then renewed his request after this case was submitted, asking us to "postpone" submission until his "representation is straightened out." We reaffirm our prior denial. *See* Iowa R. App. P. 6.901(8)(d). As shown, Moffitt was given tremendous latitude to prepare and present his appeal, and no further delays are warranted.

Because Moffitt's ineffective-assistance claims implicate constitutional rights, our review is de novo. *Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021).

### A. Error Preservation.

We begin by clarifying the issues properly presented for appellate review. Although Moffitt's PCR application and post-trial briefing mention intoxication as an overlooked defense, Moffitt never developed any standalone argument in support of intoxication. The PCR court recognized this point, noting diminished responsibility was Moffitt's "sole focus post-submission" and never separately adjudicating whether counsel was ineffective for failing to pursue an intoxication defense. Moffitt's PCR counsel never filed a Rule 1.904(2) motion to obtain a ruling on intoxication.[3] Without a ruling, Moffitt's intoxication arguments are not preserved for our review. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

The same is true for Moffitt's structural-error argument. For the first time on appeal, Moffitt argues that his criminal counsel committed "structural error" by failing to meaningfully test the prosecution's case. *See State v. Feregrino*, 756 N.W.2d 700, 707 (Iowa 2008). Because this argument was never raised to, or decided by, the PCR court, error is not preserved. *Meier*, 641 N.W.2d at 537.[4]

---

[3] Moffitt tried to file a pro-se motion after the PCR court denied his application, which advocated for involuntary intoxication as a defense. However, Moffitt was represented and thus the court took no action in response to the filing, *see* Iowa Code § 822.3A(1) (2021), and, in any event, parties may not raise new arguments in Rule 1.904(2) motions. *See Winger Contracting Co. v. Cargill, Inc.*, 926 N.W.2d 526, 543 (Iowa 2019).

[4] Moffitt's briefing also makes several allusions to his PCR counsel providing ineffective assistance. Because we find those claims require additional development and thus are not resolvable on direct appeal, we do not reach those arguments. *See Goode v. State*, 920 N.W.2d 520, 526 (Iowa 2018).

**B. Diminished Responsibility.**

In the lead-up to the criminal trial, Moffitt's counsel gave notice of various possible defenses, including insanity and diminished responsibility. He also prepared proposed jury instructions for diminished responsibility. Counsel then spoke with the defense's expert, who believed Moffitt "had not only capability to form specific intent but had in fact formed specific intent" to kill Michael. The expert indeed testified during trial that Moffitt intended to shoot Michael, so counsel ultimately forwent the diminished-responsibility instruction.

As counsel explained in his PCR testimony, the diminished-responsibility defense undermines the ability to form specific intent, and because the evidence at trial overwhelmingly showed that Moffitt acted with the specific intent to kill Michael, counsel believed there was "no factual basis which would allow the submission" of the defense. *See State v. Krogmann*, 998 N.W.2d 141, 153 (Iowa 2023) (explaining "[t]he diminished responsibility defense allows a defendant to negate the specific intent element of a crime by demonstrating due to some mental defect she did not have the capacity to form that specific intent" (citation omitted)).

Moffitt argues counsel's rationale was flawed for two reasons: (1) his expert from the criminal trial testified during the PCR action that he believed Moffitt had diminished capacity and that the defense could have succeeded, which suggests counsel did not adequately investigate the availability of the defense; and (2) even if Moffitt did intend to kill, the diminished-responsibility defense could have still undermined whether he acted "willfully." We disagree.

For starters, Moffitt confuses the expert's medical opinion of Moffitt's mental state and the legal requirements for a diminished-responsibility defense. The

expert was clear during his PCR testimony that he was "not aware" of the "legal sense" of "willful" or "voluntary," and only used those terms "in their common sense." The expert also agreed that Moffitt planned the murder ahead of time and pulled the trigger "with the goal of killing" Michael. Thus, the expert's testimony during both the criminal and PCR trial tracks with counsel's rationale—Moffitt could form, and did form, the specific intent to kill Michael, eroding the viability of the defense. *See State v. Jacobs*, 607 N.W.2d 679, 684–85 (Iowa 2000) (affirming rejection of diminished-responsibility defense when defendant "planned, organized and concealed" his illegal conduct); *Lamasters v. State*, 821 N.W.2d 856, 869 (Iowa 2012) (finding no error by counsel in omitting a diminished-responsibility instruction, as the defendant's "elaborate efforts to *conceal* the killing seem to belie the notion that he lacked the mental capacity to *premeditate* a killing"). Thus, the expert's PCR testimony does not undermine counsel's reasoned decision at trial to forgo the defense.

Moffitt next argues that "willfulness" is a separate component of specific intent apart from "intent to kill," so counsel could have still used a diminished-responsibility defense to disprove the willfulness of his conduct. Yet even if we assume his argument is correct as a legal proposition, which the State forcefully contests, Moffitt fails to connect the dots between his alleged mental-health status and a lack of willfulness. "Willful" in the context of murder "means intentional and not accidental." *State v. Hofer*, 28 N.W.2d 475, 483 (Iowa 1947). Again, Moffitt's own expert was resolute on this point—Moffitt did not accidentally shoot Michael but rather planned the killing and pulled the trigger intending to kill Michael. While the expert offered his view of Moffitt's mental state and motive—opining Moffitt was

under a medication-fueled "delusion" that "if he can kill the fiancé of his ex-girlfriend, he'll be ok"—the expert was unwavering in his belief that the murder was not accidental.  This bolsters counsel's rationale for pursuing the insanity defense over diminished responsibility, as the expert believed Moffitt wanted to kill Michael but, due to his medications, could not comprehend that killing him was wrong.  Thus, we find counsel's decision not to pursue the diminished-responsibility defense reasonable and well within the bounds of professional competence.

In sum, because Moffitt's criminal counsel did not breach any essential duty in the course of representation, we affirm denial of PCR.

**AFFIRMED.**